******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* NECTOR MARRERO
## (AC 41022)

Prescott, Elgo and Sheldon, Js.

*Syllabus*

The defendant, who had been convicted of the crimes of home invasion, burglary in the first degree and assault in the second degree, appealed to this court, claiming, inter alia, that he was denied his due process right a fair trial as a result of prosecutorial impropriety. The defendant had kicked in the door of his former girlfriend's home and physically assaulted her. After the police received a tip that he had been in contact with his then current girlfriend, G, who was incarcerated, the police obtained and examined G's phone records and discovered that she had had several calls with someone who used the same phone number that the victim had given to the police for the defendant. The police thereafter obtained copies of G's recorded phone calls from the Department of Correction, transcripts of which were admitted into evidence. In the transcript of one call, the caller admitted that he had gotten drunk at the home of a friend, J, after which he kicked in the door of the victim's home and began fighting. In the transcript of the second call, the caller told G that he was on the run because the police had gone to his mother's house to ask about G's stolen car. At trial, the victim changed her story and testified that her injuries were not caused by the defendant but occurred when she fell down stairs in her home, and the defendant presented an alibi defense in which J testified that the defendant was with him at J's home on the evening of the assault. *Held*:

1. The defendant could not prevail on his claim that the prosecutor committed improprieties by using excessive leading questions in his direct examination of the victim, by refreshing the recollection of a witness with a document different from the one he stated that he used for that purpose, and stating in closing argument to the jury, without supporting evidence, that the victim had been threatened or otherwise influenced by the defendant to deny her claim against him and to instead insist that she had been injured when she fell down stairs in her home:

   a. The sequences of leading questions that the defendant challenged did not constitute acts of prosecutorial impropriety under *State* v. *Salamon* (287 Conn. 509), as they were not improper in the evidentiary sense under the applicable provision (§ 6-8) of the Connecticut Code of Evidence or in the constitutional sense, in that they did not threaten his due process right to a fair trial: because the defendant objected to only one of the prosecutor's several leading questions, the answer to each subsequent leading question was permitted to stand and be given whatever weight the jury chose to give to it, and operated as a waiver of any claim by the defendant of evidentiary error on the ground of improper leading of the witness that he might otherwise have raised on appeal, the defendant's claim that the prosecutor improperly asked the victim leading questions without obtaining the court's permission to do so or establishing any valid legal basis for so doing was meritless, as the defendant's appellate counsel conceded at oral argument before this court that the victim was hostile to the prosecution throughout her testimony, and, in the absence of any objection by the defendant, the court had no sua sponte right or duty to intervene, and no advance judicial determination as to the propriety of the prosecutor's leading questioning was required; moreover, the defendant's claim that the prosecutor used a leading question to identify the victim's injuries before evidence as to those injuries had been introduced was unavailing, as it was not improper for the prosecutor to include facts in those leading questions as to which no other evidence had yet been introduced, as long as he had a good faith basis for doing so, there was no merit to the defendant's claim that the prosecutor improperly responded to the victim's assertion about her injuries by asking questions that indicated to the jury that she changed her story from the one she had given to the police and that she changed her story frequently, and, although the defendant claimed that the prosecutor's leading questions improperly

suggested to the jury that the victim previously stated that the defendant was the caller on the recordings of G's phone conversations, it was not constitutionally improper for the prosecutor to pose those questions, as the defendant pointed to nothing in the challenged questions that appealed to the jury to accept the prosecutor's statements as true, and it was highly unlikely that the mere asking of the challenged questions would cause the jury to draw that inference, as there was substantial evidence that the defendant was the caller; furthermore, the prosecutor's challenged leading questions about the defendant's alleged threatening phone call to the victim were proper because of the witness' hostility to the prosecution and the defendant's lack of any challenge to the prosecutor's good faith basis for asking the leading questions, and there was nothing about the substance of or manner in which the questions were asked that did any more than ask the witness to admit or to deny the truth of the statements concerning her alleged receipt of a threatening phone call from the defendant and her later report of that phone call to the police.

b. The record was inadequate to determine whether, as the defendant claimed, the prosecutor improperly refreshed a witness' recollection by showing the witness a police document different from the one he purported to show the witness for that purpose, as there was no basis to establish that the witness did not in fact prepare the document at issue, and the defendant did not move during the pendency of this appeal to reconstruct the trial court record to identify the document.

c. The prosecutor's comments in closing argument to the jury about the victim's inconsistent statements as to how she had suffered her injuries were not improper, as they were based on reasonable inferences that were supported by the evidence: the challenged comments did not refer to or make substantive use of any of the statements of fact in the prosecutor's previous leading questions to the victim, and the prosecutor did not refer to the victim's having received a threatening phone call from the defendant, as was suggested in his prior leading questions to her, but, instead, suggested that the jury should consider the victim's original statements to be more credible than her trial testimony because, unlike her trial testimony, her original statements were made in the immediate aftermath of the incident at issue; moreover, the prosecutor's argument as to the reasons for the victim's change in her story was proper, as it merely pointed out and drew upon the victim's experience with the defendant, the fear it aroused in her and the logical effects it may have had on her desire to testify against him, and the defendant's failure to object to the prosecutor's argument suggested that his counsel did not perceive the argument to be improper.

2. The defendant could not prevail on his claim that the trial court abused its discretion by admitting into evidence recordings of G's phone calls with him, which was based on his claim that the court improperly prevented him from exploring the state's ability to authenticate his voice on the recordings: although the defendant raised the authentication issue during a pretrial hearing, in which the court responded by stating that the recordings would be admitted subject to authentication by the state, the defendant made no objection when the state introduced them during trial, he did not attempt to voir dire any witnesses about them before they were admitted, he never argued that the state failed to lay a proper foundation to authenticate them or move to strike any testimony about them after he realized that the state failed to meet its burden of authentication, and, as there was no basis in the record for the court's ruling striking the testimony of a police officer who identified the defendant's voice on the recordings after they had been admitted, this court could not determine whether the trial court abused its discretion in striking that testimony; moreover, the defendant's failure to object to the admission of the recordings during trial and to argue that the state failed to prove the identity of the caller appeared to have been a strategic choice, as he did not object to the court's decision to give the jurors during deliberations transcripts of the recordings on which his name was listed as that of the caller, and he told the jury during his closing argument that the state had failed to establish that it was his voice on the recordings.

3. The trial court did not abuse its discretion in instructing the jury on consciousness of guilt: although the defendant's initial objection to the instruction differed from his claim on appeal, which he preserved for appellate review by excepting to the court's instruction after it was

approved and delivered, his claim was unavailing, as the record contained significant support for the court's instruction in that it was before the jury that he had a prior relationship with the victim, the jury watched the police body camera recordings that showed the bloodied victim identifying the defendant as her attacker, and the jury heard medical testimony about her injuries, read the statement she gave to the police and heard her testify that she was afraid of the defendant and had asked for a protective order against him; moreover, the victim provided the police with a phone number she knew to be that of the defendant, the billing information for that number showed that it was registered in the defendant's name, and the jury heard evidence in the recordings of the defendant's calls to G that the victim had been assaulted.

Argued September 12, 2019—officially released June 16, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of home invasion, burglary in the first degree and assault in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the jury before *White, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Matthew C. Eagen*, assigned counsel, with whom was *Emily L. Graner Sexton*, assigned counsel, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, former state's attorney, and *Joseph C. Valdes*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Nector Marrero, appeals from the judgment of conviction rendered against him after a jury trial on charges of home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), and assault in the second degree in violation of General Statutes § 53a-60 (a) (1). On appeal, the defendant claims that he is entitled to the reversal of his conviction and a new trial on all charges because (1) improprieties by the prosecutor in different parts of his trial violated his due process right to a fair trial; (2) the trial court erred in not requiring the authentication of his voice on the audio recordings of certain allegedly self-incriminating phone conversations he was claimed to have had with his incarcerated girlfriend, Amber Greco, before admitting such recordings into evidence against him; and (3) the court improperly charged the jury on consciousness of guilt. We reject each of these claims and therefore affirm the judgment of conviction.

The following facts, which the jury reasonably could have found, are relevant to our resolution of this appeal. On December 27, 2015, at approximately 4:45 a.m., the defendant kicked in the door of his ex-girlfriend's[1] home and physically assaulted her, causing her to sustain multiple injuries, including fractured orbital bones, a fractured tooth, and a two centimeter laceration under her left eye. After the assault, the victim fled to a neighbor's home, where she called the police to assist her. When officers from the Norwalk Police Department responded to the neighbor's home, they found the bloodied, injured victim in a hysterical state, crying and breathing heavily.

In the victim's initial report of the incident to the responding officers, as recorded on their body cameras, she claimed that the defendant, whom she described to the officers as her ex-boyfriend, had broken into her home and beaten her up. She gave the officers the defendant's cell phone number. As she did so, however, she pleaded with the officers not to tell the defendant that she had called them. Thereafter, the victim was taken first to a hospital, where she was treated for her injuries, and then, the next day, after being released from the hospital, to the police station, where she was interviewed about the incident and gave a signed, written statement again naming the defendant as her attacker. The victim concluded her statement by stating that she was afraid of the defendant and wanted a protective order to be issued against him.

Shortly after the police interviewed the victim, they began to search the surrounding area for the defendant. When at first they could not find him, they expanded their search to include places he was known to frequent,

including the homes of his friends and family members. As their search for the defendant continued, the police received a tip that he had been in contact with his current girlfriend, Greco, who was then incarcerated at the York Correctional Institution (York) in Niantic. Following up on that tip, the police obtained and examined Greco's phone records at York, where they discovered that she had exchanged several phone calls with someone using a phone with the same phone number for the defendant that the victim had given to the police.[2] Officers thereupon obtained copies of recordings from the Department of Correction (department) of Greco's phone calls to and from that phone number while she was at York.

Two phone calls were of particular interest to the officers—one made on December 28, 2015, the day after the victim reported the incident, and the other made about one month later, on January 30, 2016. In the first of those phone calls, which was made less than thirty-six hours after the victim reported the incident, a male caller whom Greco called "N" admitted to Greco, whom the caller called "babe" or "baby," that he had "fucked up" by doing "some dumb shit . . . ." The caller explained that he got drunk at "Little Joe's house" because "[his] bitch" had stolen his keys. He left Joe's house and went to "[his] bitch['s]" house, where he "kicked in the door and fucking just started fighting."[3] The caller further told Greco that, although he had not yet been arrested, the police were probably looking for him, and he probably would be going to jail soon. In the second recorded phone call of special interest to the police, the same male caller told Greco that he was "on the run" because the police had gone to his mother's house to ask about Greco's "stolen car."[4] After the caller and Greco discussed how to get rid of her car so they could raise money for her bail, the caller stated that he was going to change his phone number, which, shortly thereafter, the defendant did.

On February 18, 2016, the police finally located the defendant and arrested him in connection with the incident at issue on charges of home invasion, burglary in the first degree, and assault in the second degree. The defendant pleaded not guilty to those charges and elected a trial by jury.

The defendant's jury trial took place from June 27 through 29, 2017. At trial, the defendant presented an alibi defense, in support of which he called his friend, Joseph "Little Joe" Ferraro, who testified that the defendant had been with him at his home on the evening of the alleged assault. The jury found the defendant guilty on all charges. On August 18, 2017, the court sentenced the defendant to a total effective sentence of fifteen years of incarceration, ten years of which were mandatory, followed by ten years of special parole. This appeal followed.

I

The defendant first claims that the prosecutor committed improprieties on several occasions during trial in violation of his due process right to a fair trial. Specifically, the defendant claims that the prosecutor committed improprieties by (1) using excessive leading questions in his direct examination of the victim, (2) refreshing the recollection of a witness with a document different than the one he had told the court, defense counsel, and the jury he was using for that purpose, and (3) arguing in closing argument to the jury, without supporting evidence, that the victim had been threatened or otherwise influenced by the defendant to change her account of the incident by denying her initial claim that the defendant had assaulted her and insisting, to the contrary, that she had injured herself on the date of the reported assault by falling down stairs in her home. We reject each of these claims.

"[W]hen a defendant raises a claim of prosecutorial impropriety, we first must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 555–56, 212 A.3d 208 (2019). We first examine each claim separately to determine if any impropriety in fact occurred.

A

The initial focus of the defendant's claim of prosecutorial impropriety is the prosecutor's questioning of the victim on direct examination. In that examination, the defendant claims, for the first time on appeal, that the prosecutor used excessive leading questions to make prejudicial statements of fact before the jury to induce the jury to rely upon such statements as a basis for finding him guilty. He claims, in particular, that the prosecutor used this improper questioning technique to misinform the jury that, despite the victim's testimony to the contrary, she previously had (1) identified the defendant as the male caller who had made self-incriminating statements to Greco, allegedly about this incident, in recorded phone conversations between them while Greco was incarcerated, and (2) reported to the police that the defendant had threatened her over the phone to induce her to withdraw her allegations against him. We conclude that the defendant has failed to establish any impropriety in the prosecutor's use of leading questions on direct examination of the victim.

Our Supreme Court in *State* v. *Salamon*, 287 Conn. 509, 559, 949 A.2d 1092 (2008), considered a claim of prosecutorial impropriety based upon a prosecutor's allegedly excessive use of leading questions in conducting direct examinations of the state's witnesses at trial.

In *Salamon*, although the court ultimately rejected the defendant's claim of prosecutorial impropriety, it explained the rationale for basing such a claim on the excessive use of leading questions on direct examination of the state's witnesses and identified the essential facts that a defendant must prove to prevail on such a claim. As a general rule, the court noted, the use of leading questions on direct examination is prohibited. Id., citing Conn. Code Evid. § 6-8 (b).[5] The court further noted, however, that the general rule is subject to several exceptions, under which the trial court may, in its discretion, allow the use of leading questions on direct examination. Such exceptions include using leading questions to develop the testimony of a witness, to challenge a witness whose testimony has unfairly surprised the party who called the witness to testify, and to elicit testimony from a witness who either refuses to answer the direct examiner's nonleading questions due to hostility, or is unable to answer such questions clearly and coherently due to fear, memory loss, confusion, immaturity, or similar problems. See *State* v. *Salamon*, supra, 559; see also Conn. Code Evid. § 6-8 (b), commentary.

The court in *Salamon* first inquired if any of the prosecutor's questions that had been challenged as leading were improper in the evidentiary sense, in that they were objectionable as leading under § 6-8 of the Connecticut Code of Evidence. *State* v. *Salamon*, supra, 287 Conn. 560. In so doing, it determined that all of the prosecutor's leading questions, as to which defense objections on the ground that they were leading, had been overruled were properly permitted under exceptions to the general rule. Id. On that score, it concluded, inter alia, that the trial court properly had permitted the prosecutor to ask leading questions to two of the state's witnesses on direct examination—a frightened teenager who had difficulty answering nonleading questions about the defendant's alleged sexual assault of her, and a witness whose testimony was confusing because his primary language was French. See id. Because all of the leading questions put to those witnesses were proper in the evidentiary sense, the court ruled that no such question could serve as a valid legal basis for establishing a constitutional claim of prosecutorial impropriety based on the prosecutor's allegedly excessive use of leading questions in examining the state's witnesses. See id.

As to several other leading questions in the prosecutor's direct examinations of the state's witnesses, however, the court in *Salamon* found that they had been improper in the evidentiary sense, and thus that defense objections to them on the ground of leading had properly been sustained. See id. Notwithstanding the evidentiary impropriety of such leading questions, however, the court declined to treat the asking of any such questions as acts of prosecutorial impropriety because the

defendant had failed to show that such questions were also improper in the constitutional sense in that they threatened his due process right to a fair trial. Id.

In making its further inquiry as to the possible constitutional impropriety of the prosecutor's leading questions, the court in *Salamon* began by noting that because the answers to all such objectionable questions had been stricken, the only way in which the questions might have threatened the defendant's right to a fair trial was if the mere asking of those questions had posed such a threat. See id. Stating that it had not been given any legal or factual basis for finding that a threat to the defendant's due process right to a fair trial had arisen from the mere asking of the challenged leading questions, the court ruled that such questions had not been constitutionally improper, and thus that the defendant had not satisfied the impropriety prong of his claim of prosecutorial impropriety. See id. Accordingly, the court rejected the defendant's claim without reaching or deciding the prejudice prong of that claim. The upshot of *Salamon* is that to establish the impropriety prong of a claim of prosecutorial impropriety based on a prosecutor's allegedly excessive use of leading questions on direct examination of the state's witnesses, the defendant must prove not only that such questioning was improper in the evidentiary sense but that it was improper in the constitutional sense as well because it threatened his due process right to a fair trial.

*Salamon* offered no fixed list of circumstances in which a prosecutor's improper use of leading questions on direct examination could, potentially, be found to threaten the defendant's right to a fair trial and, thus, to constitute an act of prosecutorial impropriety. Our case law, however, and that of our sister jurisdictions, furnish several useful examples of such circumstances, including, but not limited to, repeatedly asking improper leading questions after defense objections to those questions have been sustained,[6] asking questions stating facts that the prosecutor has no good faith basis to believe are true,[7] asking questions referencing prejudicial material that the prosecutor has no good faith basis to believe is relevant and otherwise admissible at trial,[8] calling a known uncooperative witness to testify for the purpose of putting the witness' prior inconsistent statements before the jury, ostensibly to impeach the witness, but actually to induce the jury to make substantive use of such prior inconsistent statements in deciding the issues before them,[9] and asking leading questions in such a way as to induce the jury to rely upon the truth of the factual statements made in them, even if the witness denied that such statements were true.[10]

In the present case, unlike in *Salamon*, the defendant objected to only one of the several leading questions on which he bases his present claim of prosecutorial

impropriety. As a result, the trial court made only one ruling as to the evidentiary propriety of one of the prosecutor's allegedly leading questions. Although the court overruled that objection, it did not treat the objection as a continuing one or otherwise suggest, much less rule, that any further objections on the ground of leading would be unnecessary, unwelcome, or futile. Accordingly, it remained the defendant's responsibility throughout the victim's direct examination to object to any question he wanted to preclude on the ground of leading. His failure to do so permitted the answer to each such question to stand and be given whatever weight the jury chose to give it in deciding the issues before it. It also operated as a waiver of any claim of evidentiary error, on the ground of improperly leading, that the defendant might otherwise have raised on appeal.

Here, of course, the defendant does not raise a nonconstitutional claim of evidentiary error but a constitutional claim of prosecutorial impropriety. Such a claim is not waived on appeal as a result of defense counsel's failure to raise it at trial, although defense counsel's failure to object to the underlying conduct, or to ask that appropriate curative measures be taken to lessen any prejudice potentially arising from it, is strong evidence that the conduct did not truly threaten his client's right to a fair trial. See *State* v. *Stevenson*, 269 Conn. 563, 576, 849 A.2d 626 (2004) ("[w]e emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time" (internal quotation marks omitted)). Accordingly, we must examine each sequence of leading questions now challenged to determine, as the court did in *Salamon*, if it satisfied the impropriety prong of a claim of prosecutorial impropriety because it was improper both in the evidentiary sense—because it was objectionable as leading—and in the constitutional sense—because it threatened the defendant's due process right to a fair trial. For the following reasons, we conclude that none of the questioning sequences here challenged constituted an act of prosecutorial impropriety under *Salamon*.

The defendant first claims that the prosecutor improperly asked the victim leading questions without obtaining the court's permission to do so or establishing any valid legal basis for so doing. This claim is meritless because, as the defendant ultimately conceded at oral argument before this court, the victim was demonstrably hostile to the prosecution throughout her testimony.[11] See Conn. Code Evid. § 6-8 (b). Furthermore, the law of evidence is not self-executing. A judicial

determination as to the propriety of asking leading questions on direct examination can be made only when a party opposing such questions objects to them as leading at trial. In the absence of such an objection, the court had no sua sponte right or duty to intervene. Therefore, no advance judicial determination as to the propriety of the prosecutor's leading questioning was required. See E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.19.4, p. 360 ("A party may lead its own witness whom the court has found to be hostile or who has so testified as to work a surprise or deceit on the examiner. . . . Although not essential, an express finding of surprise or hostility by the court is the better practice." (Citations omitted; internal quotation marks omitted.)).

The defendant next claims that the prosecutor identified the victim's injuries in a leading question before any evidence listing or describing those injuries had been introduced.[12] This claim fails, however, both in the evidentiary sense and in the constitutional sense, for two reasons. First, it is not improper for a prosecutor, when using leading questions to examine a hostile witness, to include facts in those questions—as to which no other evidence has yet been introduced—as long as the prosecutor has a good faith basis for believing that such facts are true. Here, defense counsel conceded at oral argument before this court that he was making no claim that the prosecutor lacked a good faith basis for asking any of his challenged leading questions. Second, the defendant's claim is unsupported by the record because substantial testimony and other evidence regarding the victim's injuries were introduced both before and after the victim testified at trial. Such evidence included both the victim's hospital records, which documented her injuries as her treaters had seen and described them, and the responding officers' body camera videos that confirmed those injuries by showing the victim's swollen and bloodied face. The challenged questions were thus not improper, either in the evidentiary sense or in the constitutional sense, as required to establish the impropriety prong of a claim of prosecutorial impropriety under *Salamon*.

The defendant further claims that it was improper for the prosecutor to respond to the victim's revised version of events—that she had sustained her injuries by falling down stairs—with questions such as, "[o]h, you're claiming you fell," and, "[o]h, you fell down the stairs. Is that what you're saying now?" The defendant argues that the prosecutor, by asking such questions, "indicated to the jury not only that the witness had changed her story from the one she gave on the police body cam[era] footage (which had not yet been introduced) or in her written statement to the police (also not yet introduced), but that she changed her story frequently." This claim, however, is meritless. Before the victim testified that she had injured herself on the

day of the reported incident—by falling down stairs in her home—the jury had in fact seen her on the responding police officers' body camera recordings telling the officers that the defendant had caused those injuries by breaking into her home and beating her up. The jury thus had ample reason to know that the victim had changed her story before the prosecutor asked her leading questions so suggesting on direct examination. The questions were not improper because they did not introduce any facts into the record that had not been introduced through other witnesses or had not been supported by proper inferences that the jury reasonably could have drawn from the evidence before it.

The defendant also raises claims of impropriety as to two other sequences of leading questions that the prosecutor asked the victim on direct examination. The defendant argues that the prosecutor asked such questions for the improper purpose of inducing the jury to accept as true and to rely upon the statements of fact included in those questions, even though the witness denied such statements and there was no other evidence to support them. The first such challenged sequence of leading questions concerned the victim's ability to identify the defendant as the male caller whose voice could be heard on the department's recording of Greco's jailhouse phone conversations admitting that he "fucked up" by kicking down the door to his "bitch['s] house" and fighting. This challenged sequence of leading questions in the prosecutor's direct examination of the victim was as follows:

"Q. Did you listen to an audio recording—a tape of a man speaking with a woman? Did you remember hearing that in our offices?

"A. Umm—

"Q. Yes?

"A. I heard a video of a man—

"Q. An audio. It's a tape on a computer. You heard an audiotape on a computer?

"A. Yes, I heard—

"Q. Who was the man on that tape?

"A. I'm sorry?

"Q. Who was the man speaking—

"A. Can you tell me who the man was?

"Q. No. Didn't you tell us who the man was?

"A. I'm sorry?

"Q. You don't remember telling us who the man was?

"A. No."

The defendant claims that this sequence of leading questions threatened his due process right to a fair trial

by suggesting to the jury, without supporting evidence, that the victim had previously stated that the defendant was the male caller whose voice could be heard on the recording of Greco's jailhouse phone conversations while Greco was incarcerated at York. Such a suggestion, he asserts, was especially damaging because, apart from the prosecutor's suggestion, there was nothing in the record tending to identify him as that male caller who had made several potentially damaging statements to Greco about his involvement in an incident very similar, if not identical, to the one the victim initially had reported.

To reiterate, despite the defendant's initial claim that the prosecutor did not lay a foundation for asking the victim leading questions on direct examination based on her hostility to the prosecution, the record is replete with evidence to the contrary, as the defendant's appellate counsel conceded at oral argument before this court. Counsel also conceded at oral argument that he was making no claim that the prosecutor lacked a good faith basis for asking any of the challenged leading questions. In light of those concessions, the defendant was left with no basis for claiming that the substance of the prosecutor's leading questions should not have come before the jury, except that they were asked in such a way as to induce the jury to accept and rely on the truth of the facts stated in them even if the victim denied them.

The defendant, however, has pointed to nothing in the challenged questions that appealed to the jury to accept the prosecutor's statements as true even if the witness should deny them, as in fact she did. The questions were brief and to the point, and the prosecutor did not suggest that he was in possession of evidence outside of the record that independently established the truth of the facts stated in them. Moreover, the ultimate inference supported by such statements of fact—that the defendant was the male caller who had admitted his involvement in an incident very similar, if not identical, to the incident here at issue—was supported by substantial evidence, making it highly unlikely that the prosecutor's mere asking of the challenged leading questions would cause the jury to draw that inference. Among such evidence was testimony that the caller was a male who called Greco, the defendant's girlfriend, "babe" or "baby," and whom Greco called by the defendant's initial, "N"; the caller used a phone that was registered to the defendant in his own name and at his mother's address; the caller's first statements to Greco about a similar incident were made on the day after the incident reported by the victim; the caller noted in his first call about the incident that he had spent time on the evening of that incident with a friend named "Little Joe" before going to and kicking down the door of "[his] bitch['s] house"; and the defendant's defense at trial was that he had spent that very

evening with a friend named "Little Joe."

Considered in light of that evidence, it was not constitutionally improper for the prosecutor to pose leading questions to the victim, a hostile witness, about whether she had previously identified the defendant as the male caller who had made the damaging admissions to Greco in the recorded phone conversations.

The defendant finally claims that the prosecutor's use of leading questions threatened his due process right to a fair trial by suggesting to the jury that he had phoned the victim and threatened her to induce her to withdraw her accusations against him.[13] The sequence of questions upon which he bases this claim was as follows:

"[The Prosecutor]: On January 27, 2016, in the afternoon, did you call Officer [Bruce] Lovallo and tell him that you had received a phone call from [the defendant]?

"[The Victim]: No.

"[The Prosecutor]: And did you relay to the officer what [the defendant] told you?

"[The Victim]: No.

"[The Prosecutor]: And that you gave the police officers [the defendant's] phone number?

"[The Victim]: No, I did not.

"[The Prosecutor]: And that [the defendant's] conversation with you was, in essence, a threat?

"[The Victim]: No, I did not, because I was never threatened by him. So—ever.

"[The Prosecutor]: And do you recall coming to court the day that the defendant filed a motion with [the] court that he wanted his trial to go forward? And you, all of a sudden that day, showed up and asked the state [to have] the charges dropped?

"[The Victim]: I'm sorry?

"[The Prosecutor]: Do you recall coming by on a day, uninvited. We didn't request that you come by. And you came by as a surprise. And you came by to tell us that you wanted the charges dropped?

"[The Victim]: No. I have not even spoken with him or any of his—anybody about this case at all. So, that is false."

The defendant claims that, by posing these questions to the victim, the prosecutor introduced evidence of uncharged misconduct concerning the defendant "to insinuate that [he] had engaged in tactics designed to threaten and intimidate [the victim] and prevent her from testifying truthfully." Such questions, the defendant claims, were improper because they suggested to the jury that the prosecutor had knowledge of the defendant's threatening call, and thus that they should

rely upon his statements about the call, even in the absence of supporting evidence, as a basis for finding the defendant guilty.

To reiterate, however, it is proper for a prosecutor to lead a hostile witness about matters not yet in evidence as long as the prosecutor has a good faith basis for believing in the truth of the facts suggested by his questions and for believing that such facts, if the witness admits them, will be relevant and otherwise admissible at trial. Such leading questioning is proper unless the prosecutor asks the questions in such a manner as to vouch for the truthfulness of the statements of fact included in them or otherwise to urge the fact finder to rely on the truth of those statements in reaching a verdict, even if the witness denies them and there is no other evidence in the record to support them.

By this standard, the prosecutor's challenged questions about the defendant's alleged threatening phone call to the victim were proper for several reasons. First, such questions were properly put to the witness in leading form because of the witness' hostility to the prosecution. Second, the defendant admittedly did not challenge the prosecutor's good faith basis for asking any of his leading questions at trial. Third, there is nothing about the substance of the questions or the manner in which the prosecutor asked them that did any more than ask the witness to admit or deny the truth of the statements concerning her alleged receipt of a threatening phone call from the defendant and her later report of that phone call to the police. The prosecutor did not vouch for the truth of the facts so suggested or ask questions in such a way as to suggest that he personally disbelieved her denials or had extrinsic evidence to contradict those denials. Rather, as with any questioning sequence that a questioner is permitted to use in examining an adverse witness without having the right to contradict the witness if the witness should deny the truth of his suggestions, the prosecutor simply posed his questions to the witness and let the matter drop when she answered them in the negative. See, e.g., *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 128, 124 A.3d 501 (2015) ("[T]he only way to prove misconduct of a witness for impeachment purposes is through examination of the witness. . . . The party examining the witness must accept the witness' answers about a particular act of misconduct and may not use extrinsic evidence to contradict the witness' answers." (Citation omitted; internal quotation marks omitted.)); see also *Martyn* v. *Donlin*, 151 Conn. 402, 407–408, 198 A.2d 700 (1964) (extrinsic evidence inadmissible to prove particular acts of misconduct going solely to witness' veracity).

In this case, the defendant has not challenged the prosecutor's good faith basis for asking the victim about the defendant's alleged threatening phone call. Given

that the prosecutor's questions were limited to asking the witness if she had received such a call and reported it, without improperly vouching for the truth of any suggestion, there was no constitutional impropriety in asking the victim about it. See, e.g., *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995) ("[a] cross-examiner may inquire into the motivation of a witness if he or she has a good faith belief that a factual predicate for the question exists"). Accordingly, we reject the defendant's final claim of prosecutorial impropriety, which was based upon the prosecutor's alleged use of excessive leading questions on direct examination of the state's witness.

B

The defendant next claims that the prosecutor improperly refreshed the recollection of a witness. Specifically, he argues that the prosecutor improperly refreshed Officer Steven Luciano's recollection on direct examination by showing him a document different than the one he purported to show the officer for that purpose. We disagree, concluding that this aspect of the defendant's claim of prosecutorial impropriety is unsupported by the record before us.

The following facts are relevant to this claim. The prosecutor, as previously noted, sought to introduce certain department recordings of phone conversations between the defendant's incarcerated girlfriend, Greco, and a male caller the prosecutor claimed to be the defendant, who was then using a cell phone with the same number as that which the victim had told the police was the defendant's number. In order to connect the defendant to the recordings, which contained self-incriminating statements by the male caller that the prosecutor claimed to concern the assault at issue in this case, the prosecutor questioned Officer Luciano about the address that the defendant had given when he was arrested to demonstrate that it was the same address as the one listed by the cell service provider in the billing account information for the male caller's cell phone. To that end, the prosecutor asked the following sequence of questions to Officer Luciano concerning the address that the defendant had provided when the officer arrested him:

"Q. And do you recall the address he gave you?

"A. At the time of arrest?

"Q. Yes.

"A. No, I do not. I don't recall.

"Q. Okay. Just a moment. . . .

"Q. Did you prepare arrest police reports?

"A. I did. . . .

"Q. All right. So, if I were to show you this part of the police report, is it enough to refresh your recollection

as to the address that [the defendant] gave you at the time of your arrest?

"A. Yes it does.

"Q. And what address was that?

"A. 126 North Water Street, Greenwich, Connecticut.

"Q. The same address that the phone records would go to?

"A. Correct."

The defendant claims that the prosecutor's refreshing of the officer's recollection was improper because none of the police reports he authored in this case listed the defendant's address as "126 North Water Street, Greenwich, Connecticut . . . ." The defendant therefore claims that the prosecutor improperly must have shown the officer a document different than the one mentioned in his question, ostensibly on the basis of his refreshed recollection.

"A [witness'] memory may be refreshed by any memorandum, object, picture, sound, or smell that can in fact stimulate present recollection." E. Prescott, supra, § 6.21.2, p. 364. "Any memorandum which can in fact stimulate the present recollection may be used, whether made by the witness or not, whether it be the original or a copy, or whether made at the time of the events testified to or not." (Internal quotation marks omitted.) *State* v. *Rado*, 172 Conn. 74, 79, 372 A.2d 159 (1976), cert. denied, 430 U.S. 918, 97 S. Ct. 1335, 51 L. Ed. 2d 598 (1977). "The procedure for refreshing the recollection of a witness who has taken the [witness] stand ordinarily entails counsel['s] . . . hand[ing] her a memorandum to inspect for the purpose of refreshing her recollection, with the result that when she speaks from memory thus revived, her testimony is what she says, not the writing. . . . A safeguard to this procedure is the rule which entitles the adverse party, when the witness seeks to resort to the memorandum, to inspect the memorandum so that she may object to its use if ground appears, and to have the memorandum available for her reference in cross-examinat[ion] . . . . With the memorandum before her, the cross-examiner has a good opportunity to test the credibility of the [witness'] claim that her memory has been revived, and to search out any discrepancies between the writing and the testimony." (Citation omitted; internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 535, 673 A.2d 1117 (1996).

Although the defendant acknowledges that a witness' memory can be refreshed with any document, he argues that the prosecutor misled the court, the jury, and defense counsel by explicitly asking Officer Luciano whether he had written any "arrest police reports" that might refresh his recollection as to the address the defendant had given when he was arrested, before hand-

ing the officer a document for that purpose. This action, the defendant claims, implied that the document the prosecutor was showing the officer was one of the officer's "arrest police reports . . . ." Such an implication was misleading and improper, the defendant claims, because he later discovered, upon subsequent investigation, that the officer had not written any police reports in this case that contained the defendant's Greenwich address.

So presented, this claim has two fatal flaws that prevent us from reviewing it. First, apart from the defendant's own unsubstantiated representations concerning the results of the subsequent investigation he claims to have been conducted as to the contents of Officer Luciano's police reports in this case, there is no basis in the record for establishing that Officer Luciano did not in fact prepare a police report listing the defendant's Greenwich address in this case. Second, while this appeal was pending, the defendant did not move to reconstruct the trial court record to identify the document that was used to refresh the witness' recollection. As a result, we have no factual basis on which to rely in assessing this claim. Because we cannot rely on the representations of counsel to establish the factual basis for a claim on appeal, we cannot review this unsupported aspect of the defendant's prosecutorial impropriety claim.

"The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989). Because the record is inadequate to determine what document was used to refresh the witness' memory, we cannot determine whether any impropriety has occurred.

C

The defendant also claims that, during closing argument, the prosecutor improperly argued facts that were not in evidence. Specifically, the defendant claims that the prosecutor improperly attempted to explain the victim's inconsistent statements as to how she had suffered the injuries she initially accused the defendant of inflicting upon her by arguing, without supporting evidence, that the defendant had threatened her before trial and thereby caused her to deny her prior allegations against him. We disagree.

The defendant argues that the following statement by the prosecutor regarding the victim's inconsistent testimony was improper: "[I]f you set aside that inconsistency and you choose to look at the evidence that

[the victim] gave in the very beginning, when she was not under the influence of other people, when no one had an opportunity to persuade her and ask and beg her or induce her to change her testimony, what did [the victim] say?" The defendant claims that this statement was improper because no evidence was introduced at trial showing why the victim had changed her story. The defendant claims that the only statement by a trial participant suggesting that the victim had changed her story because the defendant had influenced her to do so was that of the prosecutor when he asked the victim, in a leading question she answered in the negative, if she had informed one of the investigating police officers that the defendant had threatened her in a phone call. That question, as previously noted, was asked during the following portion of the prosecutor's direct examination of the victim:

"Q. On January 27th, 2016, in the afternoon, did you call Officer Lovallo and tell him that you had received a phone call from [the defendant]?

"A. No.

"Q. And did you relay to the officer what [the defendant] told you?

"A. No.

"Q. And that you gave the police officers [the defendant's] phone number?

"A. No, I did not.

"Q. And that [the defendant's] conversation with you was, in essence, a threat?

"A. No, I did not because I was never threatened by him. So—ever."

The defendant argues that the prosecutor's comments during closing argument "harkened back" to the foregoing colloquy because the prosecutor thereby insinuated that the defendant's alleged threat had influenced the victim's testimony. Because the victim denied that the defendant had ever threatened her and no other witness testified to such a threat, the defendant insists that there was no evidence in the record to support the prosecutor's argument that the victim changed her story because of the defendant's threat.

"It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument . . . . The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . .

Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . [I]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Furthermore, this court realizes that the credibility of the witnesses was central to the case. [The jury] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 81 Conn. App. 1, 8–9, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004).

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . Our case law reflects the expectation that jurors will not only weigh conflicting evidence and resolve issues of credibility as they resolve factual issues, but also that they will consider evidence on the basis of their common sense. Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) Id., 13. "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

The defendant's claim that the prosecutor's comments during closing argument were improper fails for several reasons. First, contrary to the defendant's argument on appeal, the prosecutor's challenged comments did not refer to or make substantive use of any of the statements of fact set forth in his leading questions to the victim, all of which the victim had denied. Whereas the prosecutor's leading questions had suggested that the victim had received a threatening phone call from the defendant, which she later reported to the police, his closing argument made no reference to any such phone call, or to the report of such a phone call to the police. Instead, the prosecutor asked the jury more generally to consider the difference in circumstances between the time when the victim first reported the incident and the later time when she testified at trial. In this regard, the prosecutor suggested only that the

jury should consider the victim's original statements to be more credible than her trial testimony because those statements, unlike her testimony, had been made in the immediate aftermath of the incident, while she was in the presence of her neighbors, her medical treaters, and the police, before anyone with an interest in causing her to change her story had yet had a chance to try to influence her to do so. The jury had been shown the body camera recordings of the victim, seriously injured, upset, and crying, as she reported the assault to the responding officers and pleaded with them not to tell the defendant that she had called for their assistance. The jury had also reviewed the victim's medical records, in which her medical treaters had described her injuries and recorded her very similar account of how she had received them at the hands of the defendant. Furthermore, the jury had read the victim's signed written statement concerning the incident, in which, once again, she had accused the defendant of assaulting her and requested that a protective order be issued against him.

In view of the consistency of the victim's initial allegations that the defendant had assaulted her and the strength of the evidence supporting those allegations, her surprising withdrawal of those allegations at trial surely required an explanation. To make sense of this uncorroborated change in the victim's story, the jury reasonably could have inferred that something significant had happened to bring about that change. Although the jury had no evidence before it about any contact between the defendant and the victim, other than the assault itself, it had heard from her initial report that the defendant had brutally beaten her and that she was very much afraid of him, as evidenced by her plea that the police not tell the defendant that she had called them and by her request for a protective order. With or without an explicit threat to her well-being if she persisted in accusing him of crimes that could result in his long-term incarceration, her fear was so great that any suggestion of such a threat, real or imagined, could have caused the victim to back away from her story to avoid courting disaster in the future. Her vulnerability to his violence, and her fear of such violence in light of its painful consequences, which she claimed to have experienced, could reasonably have been inferred to be the motivating force behind her wholesale abandonment of her original allegations against the defendant at the time of trial. The prosecutor's argument as to the reasons for the victim's change in story was proper because it merely pointed out and drew upon her harrowing experience with the defendant, the understandable fear it had aroused in her, and the logical effects it may have had on her desire to testify against him. See *State* v. *Fauci*, 282 Conn. 23, 45–46, 917 A.2d 978 (2007) ("As we previously have noted, [w]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts

to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. . . . In other words, a prosecutor's remarks are not improper when they underscore an inference, on the basis of the evidence presented at trial, that the jury could have drawn on its own." (Citation omitted; internal quotation marks omitted.))

Additionally, the defendant did not object to the prosecutor's argument at trial. A defendant's failure to object to an alleged impropriety strongly suggests that his counsel did not perceive the argument to be improper. If counsel did not believe that the argument was improper at the time, it is difficult for this court, on review, to reach a contrary conclusion. Our Supreme Court in *State* v. *Stevenson*, supra, 269 Conn. 576, expressly addressed the impact of a defendant's failure to object at trial to what he later claimed to have been an act of prosecutorial impropriety: "We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time." (Internal quotation marks omitted.)

For the foregoing reasons, we conclude that the prosecutor's challenged comments in his closing argument were not acts of prosecutorial impropriety because they were based upon reasonable inferences supported by the evidence. We, therefore, reject this final aspect of the defendant's claim of prosecutorial impropriety.

## II

The defendant next claims that the trial court erred by "preventing the defendant from exploring the state's ability to authenticate [the] defendant's voice on the phone recordings." The defendant argues that the state did not offer any evidence "that the voice on the recordings was that of the defendant" and that the "trial court prevented either party from eliciting testimony related to whether witnesses could identify the voices on the recordings." We disagree.

The following additional facts are relevant to this claim. Officer Luciano testified that the victim had provided a known cell phone number for the defendant. While searching for the defendant, Officer Luciano submitted a request to Sprint, the cell service provider for the phone with that number, for the records associated with that phone. Sprint complied by providing the account information for that phone, which showed that it was a prepaid cell phone that had been registered to "Nector Marrero" of 126 North Water Street, Greenwich, Connecticut, the known address of the defen-

dant's mother.

The prosecutor informed the court in a pretrial hearing that he intended to offer recordings of Greco's prison phone calls into evidence at trial. Defense counsel did not object to the proposed admission of such recordings at that time but noted that he "would just ask for the proper foundation to be laid before" they were introduced.[14] The trial court responded that the recordings would be admitted "subject to the . . . state authenticating [them] . . . ."

During the trial, this matter arose on only two occasions. First, during the direct examination of Officer Luciano, the officer testified that, "the [phone record] [indicated] that it was [the defendant] and, based on his voice, it appeared to be [the defendant] when I heard the recording." When the defendant objected to this answer, a sidebar was held, after which the trial court ordered the officer's testimony identifying the male caller's voice as that of the defendant to be stricken. Neither the ground for the objection nor the basis for the court's ruling was ever put on the record.

Second, the matter arose during the cross-examination of Officer Luciano, when the defendant questioned the officer about his ability to identify the defendant's voice. The following colloquy then occurred:

"[Defense Counsel]: Okay. You don't know [the defendant's] voice, do you?

"[Officer Luciano]: I've had prior interactions with [the defendant]—

"[Defense Counsel]: Were—

"[Officer Luciano]: —on a positive level.

"[Defense Counsel]: Do you have any kind of expertise in voice analysis?

"[Officer Luciano]: No, I don't.

"[Defense Counsel]: So, you couldn't positively identify a voice on a recording; correct?

"[Officer Luciano]: No.

"[The Court]: Approach bench please.

"(Sidebar)

"[Defense Counsel]: I withdraw the previous question, Your Honor."

The basis for defense counsel's withdrawal of his final question was never put on the record.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining

the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 179 Conn. App. 734, 761, 181 A.3d 118, cert. denied, 328 Conn. 927, 182 A.3d 637 (2018).

" 'Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court.' Conn. Code Evid. § 1-3 (a). 'The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be.' Conn. Code Evid. § 9-1 (a). The official commentary to § 9-1 (a) of the Code of Evidence provides in relevant part: 'The requirement of authentication applies to all types of evidence, including writings, sound recordings, electronically stored information, real evidence such as a weapon used in the commission of a crime, demonstrative evidence such as a photograph depicting an accident scene, and the like. . . . The category of evidence known as electronically stored information can take various forms. It includes, by way of example only, e-mails, Internet website postings, text messages and "chat room" content, computer stored records and data, and computer generated or enhanced animations and simulations. As with any other form of evidence, a party may use any appropriate method, or combination of methods . . . or any other proof to demonstrate that the proffer is what the proponent claims it to be, to authenticate any particular item of electronically stored information.' " *State* v. *Smith*, supra, 179 Conn. App. 761–62.

Although the defendant admits that he "did not preserve this claim in the classical manner through straightforward objection," he argues that the claim was preserved because he did object at the pretrial hearing, and thus the typical reasons for preventing the review of unpreserved claims are not present in this case. The defendant claims that the trial court prevented either side from eliciting testimony regarding authentication, referencing the two statements the court had stricken during Officer Luciano's testimony. The defendant argues that these rulings signaled to defense counsel that it would be futile to continue objecting to such statements. We disagree.

The defendant did raise the issue of authentication during the pretrial hearing. The trial court responded by ruling that the recordings would be admitted subject to authentication by the state. The defendant, however, made no subsequent objections to the recordings when the state introduced them during trial. The defendant did not attempt to voir dire any of the witnesses about the recordings prior to their introduction. The defendant never argued to the court that the state had not yet laid a proper foundation to authenticate the recordings before they were admitted into evidence, nor did he move to strike any testimony concerning the recordings or their contents after realizing that the state had failed to meet its burden of authentication. The only objection occurred when Officer Luciano was being questioned about his ability to identify the male voice on the recordings. That objection was made after the recordings had already been admitted into evidence. Because the basis for the court's ruling to strike Officer Luciano's voice identification of the defendant is not in the record before us, we cannot determine whether the court's decision to strike the testimony was an abuse of its discretion. The defendant does not point to, nor does our review of the record reveal, any other occasions when the court prevented the defendant from questioning the witnesses about the authentication of his voice as that of the male caller on the recordings.

Moreover, not only did the defendant not challenge the introduction of the recordings during trial, he did not challenge the court's decision during the jury's deliberations to give the jurors a transcript of the recordings on which the defendant's name was listed as that of the male caller. Although the court advised the jurors that the transcript was not evidence—that it was meant to serve them only as a guide, and that if anything in the transcript was different from what they had heard in the recording, the recording should prevail—the transcript still went into the jury room by agreement and without objection.[15] The Connecticut Code of Evidence is not self-enforcing. It is incumbent upon lawyers to invoke the rules of evidence in accordance with their own evaluation of any violation they become aware of and of its impact upon their trial strategy. "[W]hen opposing counsel does not object to evidence, it is inappropriate for the trial court to assume the role of advocate and decide that the evidence should be stricken. . . . The court cannot determine if counsel has elected not to object to the evidence for strategic reasons. . . . Experienced litigators utilize the trial technique of not objecting to inadmissible evidence to avoid highlighting it in the minds of the jury. Such court involvement might interfere with defense counsel's tactical decision to avoid highlighting the testimony. When subsequent events reveal that it was an imprudent choice, however, the defendant is not entitled to turn the clock back and have [the appellate court] reverse

the judgment because the trial court did not, sua sponte, strike the testimony and give the jury a cautionary instruction." (Internal quotation marks omitted.) *State* v. *Elias V.*, 168 Conn. App. 321, 335, 147 A.3d 1102, cert. denied, 323 Conn. 938, 151 A.3d 386 (2016).

Furthermore, the defendant later claimed in closing argument that the state had failed to establish that it was the defendant's voice on the recordings. In his argument, while discussing the recordings, defense counsel stated: "So, we don't know who opened the [cell phone] account. But let's assume [that the defendant] did. We don't know that that's his voice on the recording. No one confirmed that that was his voice on that recording. Nobody came in and said it. No one was asked. Do you know whose voice that is? I mean, that's reasonable doubt, too, because we don't [know] who the heck's voice that is."

Finally, the defendant claims that no witness testified that it was the defendant's voice on the recordings. On the first day of his testimony, however, Officer Luciano, testified, without objection, that the recording was "a phone conversation between Amber Greco and a male, whom I believe to be [the defendant]."

The defendant appears to have made the conscious decision not to seek any remedies available in the trial court to limit damage potentially arising from this question, instead choosing to argue the state's failure to authenticate and identify the voice on the recordings in closing argument as a basis on which the jury could have found him not guilty. "We cannot permit an accused to elect to pursue one course at the trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him. . . . [T]he protection which could have been obtained was plainly waived . . . . The court only followed the course which he himself helped to chart . . . ." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 208, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). The failure to object and the decision to argue the state's failure to prove identity on the calls appears to have been a strategic choice. Therefore, we conclude that the trial court did not abuse its discretion in admitting the challenged recordings as it did. Accordingly, we reject the defendant's second claim.

### III

The defendant finally claims that the trial court improperly gave a consciousness of guilt instruction to the jury. On appeal, the defendant argues that, because "the evidence the trial court relied on to grant that [request did] not relate to the defendant's consciousness of guilt as to the alleged criminal conduct here at issue, the trial court erred in granting the instruction." We disagree.

The following facts are relevant to this claim. During a charging conference, a consciousness of guilt instruction was proposed. The court provided the prosecutor and defense counsel with a draft of its proposed charge on June 28, 2017. The parties reviewed the draft charge in chambers the next day[16] and, subsequently, a charging conference was conducted on the record.

On the record, defense counsel objected to the proposed instruction, claiming that such an instruction was inappropriate because the defendant had raised an alibi defense. Defense counsel argued: "[W]e would object to the inclusion of that instruction. The court is aware of what the defense is. Essentially, [the defendant] was not present. So, if he wasn't present, there's nothing to consciously be guilty of. So, we would object to the inclusion of that instruction." The prosecutor defended the proposed instruction in two ways. First, he argued that the defendant's avoidance of detection by the police for a great length of time after the incident was reported, despite their active efforts to inquire of his family and friends about his whereabouts, supported an inference of consciousness of guilt and justified the giving of the proposed instruction. Second, he argued that the defendant's alleged comment to Greco that he was going to change his phone number—which he later did—because the police were searching for him supported an inference of consciousness of guilt, and thus the appropriateness of giving the proposed instruction.

The court agreed with the prosecutor that sufficient evidence had been presented to support the giving of a consciousness of guilt instruction, stating: "Well, I recall testimony about the difficulty the authorities had finding [the defendant], about changing a phone number. And . . . I remember the evidence regarding the alleged conversation between [the defendant] and Amber Greco, and that recording is in evidence. And there were certain things said. And I didn't refer to them in the instruction, but it will be up to the state to argue about those statements or acts. And if the jury believes them, they may think that those statements or that conduct is circumstantial evidence indicating guilty knowledge or consciousness of guilt. And if—perhaps there's an innocent reason for those statements or conduct, and if you think there is—if the defense thinks there is one, you're free to argue it. So, in any event, your objection is noted."

During their closing arguments, both the prosecutor and defense counsel addressed whether and how the evidence cited by the court as grounds for instructing the jury on consciousness of guilt actually supported such an inference, and thus whether, and if so how, it tended to prove him guilty as charged in connection with the alleged break-in and assault reported by the victim. The main focus of these arguments was on the prosecutor's claim that the defendant was the male

caller who had made self-incriminating statements to his girlfriend, Greco, about a very similar break-in and assault in recorded phone conversations with her on the defendant's cell phone while she was incarcerated.

In its final charge, the court gave the same instruction on consciousness of guilt it had shown to counsel and approved before closing argument. That instruction read: "In any criminal case, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged [offense] may have been influenced by the criminal act; that is, the conduct or statements show a consciousness of guilt. For example, flight, when unexplained, may indicate consciousness of guilt if the facts and the circumstances support it. Such acts or statements, do not, however, raise a presumption of guilt. If you find the evidence proved and also find that the acts or statements were influenced by the criminal act and not by any other reason, you may, but are not required to, infer from this evidence that the defendant was acting from a guilty conscience. It is up to you as judges of the facts to decide whether the defendant's acts or statements, if proved, reflect a consciousness of guilt and to consider such in your deliberations in conformity with these instructions." Defense counsel took a timely exception to that instruction after it was given.

A

As a preliminary matter, we must determine whether the defendant's claim has been preserved for appellate review. Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ." "[T]he purpose of the [preservation requirement] is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 335, 849 A.2d 648 (2004).

On appeal, the defendant argues that his claim is preserved because he "objected to the inclusion of the instruction" and that the "trial court noted the defendant's objection." The state responds that the defendant's argument "misunderstands the law regarding preservation of claims." The state, citing to Practice Book § 42-16[17] and *State* v. *Tierinni*, 165 Conn. App. 839, 854–55, 140 A.3d 377 (2016), aff'd, 329 Conn. 289, 185 A.3d 591 (2018), contends that "in order to obtain appellate review, our rules not only require a timely objection, but they require the appellate claim to be distinctly raised." Here, the state claims that the defendant's initial objection on the basis of his presentation of an alibi defense is different from his present claim, which is that "there was no evidence that his evasive conduct related to the charged offenses."

Although we agree with the state that the claim presented on appeal is different from the defendant's initial objection to the proposed instruction, we conclude that the defendant preserved his present claim for review by excepting to the instruction as the court approved and delivered it. By his exception, the defendant took issue with the court's ruling that the state's consciousness of guilt evidence could appropriately be used to support an inference of his guilt as the person who had caused the victim's injuries by breaking into her home and assaulting her. The defendant thereby preserved that very claim for appellate review.

B

Turning to the merits of the defendant's claim, we conclude that his claim fails. It was well within the province of the jury to infer from the evidence before it that the defendant's actions supported an inference that he had a guilty conscience in relation to the incident in which the victim initially reported that he had attacked her, which thus tended to prove him guilty of the crimes charged against him in connection with that incident.

"[Consciousness of guilt] is relevant to show the conduct of an accused, as well as any statement made by him subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and under proper safeguards . . . is admissible evidence against an accused." (Internal quotation marks omitted.) *State* v. *Henry*, 76 Conn. App. 515, 547–48, 820 A.2d 1076, cert. denied, 264 Conn. 908, 826 A.2d 178 (2003). "Evidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, is ordinarily the basis for a [jury] charge on the inference of consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Grajales*, 181 Conn. App. 440, 448, 186 A.3d 1189, cert. denied, 329 Conn. 910, 186 A.3d 707 (2018).

"Undisputed evidence that a defendant acted because of consciousness of guilt is not required before an instruction is proper. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the

defendant. . . . Once [relevant] evidence is admitted, if it is sufficient for a jury to infer from it that the defendant had a consciousness of guilt, it is proper for the court to instruct the jury as to how it can use that evidence." (Internal quotation marks omitted.) *State* v. *Pugh*, 190 Conn. App. 794, 814–15, 212 A.3d 787, cert. denied, 333 Conn. 914, 217 A.3d 635 (2019).

"If there is a reasonable view of the evidence that would support an inference that [the defendant fled] because he was guilty of the crime and wanted to evade apprehension—even for a short period of time—then the trial court is within its discretion in giving such an instruction . . . ." *State* v. *Scott*, 270 Conn. 92, 105–106, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005).

The record before us demonstrates that there was significant support for a consciousness of guilt instruction in this case. It was before the jury that the defendant had a prior personal relationship with the victim. The jury watched the body camera recordings from the police department on which the jury could see the bloodied victim identifying the defendant as her attacker, explaining that he had come into her house and beaten her. The attending physician who treated the victim testified about her injuries as he had documented them in her medical records. The jury also read the victim's signed, written statement, given at the police station, in which she had identified the defendant as her attacker. She also stated that she was afraid of the defendant and asked for a protective order against him.

There was also evidence before the jury that the victim had provided officers with the phone number that she knew to be the defendant's. The billing account information for that number showed that the number was registered in the defendant's name at his mother's address. That phone number was the same number used to phone Greco, the defendant's girlfriend.

The jury heard further evidence that the victim was assaulted in the early morning hours of December 27, 2015. The first recorded phone call that the state presented between Greco and the male caller using the defendant's phone number was made the very next day, December 28, 2015. In that phone call, the male caller apologized to Greco, continuously called her "babe" and "baby," and stated that he had done something stupid but that he did not want to describe it over the phone. He said he had gone to "[his] bitch['s]" house and gotten into a fight and that he was sore from it. He also said that the woman he had fought with had called the police, who were probably looking for him at that time, and thus that he might go to jail soon.

The male caller further explained that he had been at "Little Joe's" house on the night he had gotten into the fight. He explained that he was at "Little Joe's"

house where he had gotten drunk and was upset because "[his] bitch" had stolen his keys and then he went to her house where he "like kicked in the door and . . . started fighting." At trial, the defendant admitted, by way of his alibi defense, that he had been at the house of Joseph Ferraro—who was known to law enforcement as "Little Joe"—on the night of the assault.

During the second phone call, the male caller, again calling Greco affectionate names and telling her that he loved her, stated that he was "on the run" as a result of the incident that he had described in a previous phone call. He stated that the police had been looking for him at his friends' and family's homes, although he said that he was being sought in connection with Greco's stolen car, which was the very story the police had been giving to his friends and family to explain why they were looking for him. He finally stated that he had gotten a new phone and was going to change his number after he sent Greco a letter with his new phone number. Shortly after that call, the name on the billing account information for that phone number was changed.

On the basis of the foregoing evidence, we determine that the trial court did not abuse its discretion in instructing the jury on consciousness of guilt. Accordingly, we reject the defendant's final claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim. See General Statutes § 54-86e.

[2] The number was associated with a prepaid cell phone that had been registered to a "Nector Marrero," whose listed address on the billing records of the cell service provider was the same as the defendant's mother's address.

[3] The male voice on the call greeted Greco by saying, "[b]aby" and proceeded to refer to Greco as "babe" or "baby" throughout the phone call. Greco greeted the caller by saying, "Hey, N." The male caller made the following statements: "Babe, I got to tell you something. . . . I fucked up yo. . . . I did some dumb shit . . . I'm not gonna say it over the phone and shit, but yeah, I kinda like got into a fight and shit and I might go to jail like soon. . . . Yeah, I might go to jail like soon. Like, I don't know, they're probably looking for me now, like, they went to Little Joes and shit. I fucked up, baby. . . . I just—I got drunk, I had gotten heavy, like drinking heavy like at Little Joes house. I fucking walked off from Joes. Fucking went to somebody's house and fucking kicked in the door and fucking started fighting. . . . I was so drunk, I was just so drunk 'cause the bitch stole my keys, you know." In response to a question from Greco about whether it was "his bitch['s] house or something," the male caller said, "[y]eah." Greco, after explaining to the male caller how to bail her out of jail, told the caller, "[w]ell, I—I need you out there and not getting, you know, pissy drunk and arrested and shit behind the girlfriend."

[4] In their search for the defendant, the police officers told people that they were looking for him in connection with Greco's stolen car.

[5] Section 6-8 (b) of the Connecticut Code of Evidence provides: "Leading questions shall not be used on the direct or redirect examination of a witness, except that the court may permit leading questions, in its discretion, in circumstances such as, but not limited to, the following: (1) when a party calls a hostile witness or a witness identified with an adverse party; (2) when a witness testifies so as to work a surprise or deceit on the examiner; (3) when necessary to develop a witness' testimony; or (4) when necessary to establish preliminary matters."

"It is axiomatic that trial courts have broad discretion to allow leading questions on direct examination depending upon the circumstances of the

individual case." (Internal quotation marks omitted.) *State* v. *Dews*, 87 Conn. App. 63, 86, 864 A.2d 59, cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

[6] See *Locken* v. *United States*, 383 F.2d 340, 341 (9th Cir. 1967) (prosecutor engaged in multiple improprieties, including continuing to ask leading questions despite sustained objections by court); *People* v. *Rosa*, 108 App. Div. 2d 531, 536–40, 489 N.Y.S. 2d 722 (1985); id., 537 (court focused on cumulative impact of many prosecutorial improprieties, including continually repeating questions on both direct and cross-examination after objections had been sustained, "shouting at the defendant's wife," "protest[ing] the [c]ourt's adverse rulings" in inappropriate manner, communicating nonverbally to jury demonstrating his contempt for defendant, vouching for witness' credibility, putting facts before jury that were not introduced into evidence, and asking irrelevant questions to prejudice defendant); *State* v. *Torres*, 16 Wn. App. 254, 257–58, 554 P.2d 1069 (1976) (court focused on amount of repetition).

[7] See *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995) ("[a] good faith basis on the part of examining counsel as to the truth of the matter contained in questions propounded to a witness on cross-examination is required" (internal quotation marks omitted)).

[8] See *Dakin* v. *State*, 632 S.W.2d 864, 866 (Tex. App. 1982) (court overturned conviction when presented with record that contained "numerous attempts by the prosecutor to present harmful facts, unsupported by the evidence, to the jury in the form of questions").

[9] See *State* v. *Williams*, 204 Conn. 523, 530, 529 A.2d 653 (1987). In *Williams*, our Supreme Court held that it recently had moved away from the common-law rule that a party could not impeach its own witness but explained: "By this holding, however, we did not mean to intimate that a state's attorney enjoys unfettered discretion in calling a witness and impeaching [his] credibility by use of inconsistent statements. The prosecution may not use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence which is admissible only for credibility purposes in [the] hope that the jury will use it substantively." (Internal quotation marks omitted.) Id.

[10] Although the following cases are not explicit examples of a court determining that a prosecutor committed improprieties, they are useful in developing our understanding of colorable claims of prosecutorial impropriety on the basis of leading questions. *State* v. *Stevenson*, 269 Conn. 563, 587, 849 A.2d 626 (2004) ("[t]he privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider" (internal quotation marks omitted)); *State* v. *Ross*, 151 Conn. App. 687, 694, 95 A.3d 1208 ("the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case" (internal quotation marks omitted)), cert. denied, 314 Conn. 926, 101 A.3d 271 (2014).

[11] The defendant's concession was well-founded. Almost as soon as the victim began testifying, she presented herself as a hostile and uncooperative witness. Within the first few questions posed to the victim, it was clear that she did not want to testify. In fact, she stated, "I don't really want to be here." When asked to identify herself in a photograph, she, at first, refused, and then said that it "[c]ould be me . . . ." Throughout her testimony, the court admonished her more than twenty-one times for not answering the prosecutor's questions, not answering the particular question posed, not audibly responding, and not speaking clearly and loudly enough for the jury to hear.

[12] The defendant explains: "Rather than [the victim] testifying that she suffered a missing tooth or a broken bone, the prosecutor, through the questioning, stated the witness' injuries . . . and, significantly, the witness never confirmed that information. The prosecutor was, in effect, using his own leading question as evidence that the witness had testified in a certain manner when the record demonstrates that she had not." (Citation omitted.)

[13] In this vein, the defendant also claims that the prosecutor improperly used leading questions to demonize the defendant and to express his opinion about the defendant's guilt. For example, the defendant cites the following question by the prosecutor: "[W]hen [the defendant] was assaulting you, did he have permission to stay in your house?" The defendant argues that this was improper because the victim did not answer the question, which left "the prosecutor's assertion that [the defendant] was, in fact, assaulting her as the only testimony the jury heard on the subject." This claim can be quickly rejected because it has absolutely no support in the record. The

majority of the victim's prior statements identifying the defendant as her attacker had already been admitted for substantive purposes prior to the victim's testimony. Therefore, because the defendant's claim lacks any factual basis, we determine that there was no evidentiary impropriety as to this claim.

[14] After a short discussion on the record, defense counsel stated that he did not object to the admission of the first recording, "[g]iven that the—the state will authenticate all the [phone] numbers." The defendant did object to the introduction of a portion of the second recording because it was not relevant and was potentially prejudicial.

[15] The court gave the jury the following instruction: "I instruct you that what is said on each audio recording, state's [exhibits] 7C and 7D, is the evidence. In other words, what's said on the tape, that is the evidence. The transcript of state's exhibit 7C, however, is not evidence and should not be treated as such by you. You are being given a transcript of state's exhibit 7C in order to assist you in understanding what is said on the audiotape. In other words, it's what's said on the tape that's the evidence, not the transcript.

"If you find that the audio recording reflected in state's exhibit 7C is different in some respect than the transcript marked court's exhibit 5, then you must ignore court's exhibit 5 to the extent that it is inconsistent with state's exhibit 7 and—and decide for yourself what you heard on the audio recording, which is included in state's exhibit 7C. It is up to you, as judges of the facts, to decide what is said on state's exhibit 7C and state's exhibit 7D, the audio recordings, and to decide the credibility of that information and to decide how much weight to—to give to such information."

[16] In chambers, the court made a "few changes to the draft and added . . . two charges." No changes were made to the charge on consciousness of guilt.

[17] Practice Book § 42-16 provides: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. The exception shall be taken out of the hearing of the jury."

---