******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* ANDRES C.*
(AC 43081)

Moll, Alexander and DiPentima, Js.**

*Syllabus*

Convicted of the crimes of sexual assault in the third degree and risk of
injury to a child, the defendant appealed to this court. The defendant's
conviction stemmed from his sexual abuse of the minor victim, his niece.
Before trial, the court granted the state's motion to allow the introduction
of uncharged misconduct evidence, specifically, evidence regarding the
defendant's sexual abuse of the victim's cousin, D. At trial, the victim
testified, inter alia, that she maintained certain journals, which related
to her abuse, and the court declined to allow the defendant access to
the journals. The prosecutors assigned the task of reviewing the journals
for exculpatory material, which were handwritten in Spanish, to a bilin-
gual investigator in their office. The court indicated that it would conduct
an in camera review of any materials that might be exculpatory, and
defense counsel did not challenge this procedure. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly
admitted uncharged misconduct evidence.
   a. This court declined to review the defendant's claim that the trial court
   erred in permitting the state to present uncharged misconduct evidence
   regarding the sexual abuse of D to show his propensity for such acts,
   because the court ultimately admitted this evidence for a limited purpose,
   namely, as an explanation for the victim's delayed disclosure of the abuse,
   and not to establish the defendant's propensity to commit such acts.
   b. The trial court properly denied the defendant's motion to strike the
   testimony regarding the uncharged misconduct evidence after the prose-
   cutors declined to call D as a witness: the evidence was admitted only
   for the purpose of explaining the victim's delay in disclosing her own
   sexual abuse by the defendant, the evidence did not have only minimal
   probative value as the victim testified that she delayed disclosing her
   abuse after she learned of the defendant's abuse of D and observed the
   subsequent shunning of D and D's mother by her family, and her testi-
   mony was not cumulative of expert testimony presented on delayed
   disclosure; moreover, contrary to the defendant's claim, the trial judge,
   as the finder of fact, was not prejudiced after hearing of the defendant's
   sexual abuse of D and was not unable to limit consideration of this
   evidence to the sole purpose for which it had been admitted, the defen-
   dant having failed to point to anything in the record to overcome the
   presumption that the court, as the trier of fact, considered only properly
   admitted evidence when it rendered its decision.

2. The defendant's claim that his right to a fair trial was violated by prosecu-
torial impropriety was unavailing: although the prosecutor erred in her
consideration of what was necessary for uncharged misconduct to be
admitted into evidence, the defendant neither demonstrated the lack of
a good faith basis by the prosecutor nor showed that his right to a fair
trial was violated, the defendant failed to establish a lack of a good
faith basis with respect to the prosecutor's attempt to admit the defen-
dant's guilty plea relating to the case involving D.C. pursuant to *North
Carolina* v. *Alford* (400 U.S. 25), and the prosecutor's efforts to admit
constancy testimony did not raise to the level of impropriety.

3. The trial court properly denied the defendant access to the victim's jour-
nals.
   a. The defendant's claim that he was entitled to review the victim's
   journals because she had reviewed them prior to her testimony was
   unavailing: the court considered the private nature of the journals, that
   the victim reviewed only a few pages of the journals before testifying,
   and that the state had been reviewing the journals for exculpatory mate-
   rial, and, thus, its decision was neither so arbitrary as to vitiate logic
   nor based on improper or irrelevant factors.
   b. The defendant waived the claim that he was entitled to the contents
   of the victim's journals because they constituted a statement pursuant
   to the rules of practice (§§ 40-13A and 40-15 (1)): defense counsel agreed

to the procedure to be used in the review of, and the potential disclosure of, the contents of the journals, specifically, the prosecutors' review of the journals for exculpatory material and to the court's in camera review of any exculpatory material, and, having agreed to this procedure before the trial court, the defense cannot now challenge that procedure.

4. The defendant could not prevail on his unpreserved claim that his rights under *Brady* v. *Maryland* (373 U.S. 83) were violated, which was based on his claim that the prosecutors were required to personally review the victim's journals for exculpatory information and that this task could not have been delegated to a nonlawyer member of their office: although, ultimately, the obligation for complying with *Brady* rests with the prosecutor, it does not follow that the personal review of items such as the victim's journals by a prosecutor is constitutionally required.

Argued March 1—officially released November 30, 2021

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the third degree, sexual assault in the fourth degree, and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Alander, J.*; judgment of guilty of sexual assault in the third degree and risk of injury to a child, from which the defendant appealed to this court. *Affirmed*.

*Richard Emanuel*, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Mary A. SanAngelo* and *Brian K. Sibley, Sr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

ALEXANDER, J. The defendant, Andres C., appeals from the judgment of conviction, rendered after a court trial, of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the court improperly admitted uncharged misconduct evidence, (2) his right to a fair trial was violated by prosecutorial impropriety, (3) the court improperly denied him access to the victim's journals, and (4) his rights under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1983), were violated.[1] We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as the court reasonably could have found, and procedural history are relevant to the resolution of this appeal. When she was ten years old, the victim, along with her mother and siblings, moved into her grandmother's home. Shortly thereafter, the defendant, the victim's uncle, moved in. At some point, during the time that the victim and the defendant were living at the grandmother's house, the defendant came out of the shower dressed only in a towel and took the victim into his bedroom. The defendant removed his towel, lay upright on the bed, and had the victim apply lotion to his penis and masturbate him. After the defendant ejaculated, he directed the victim to wash her hands. This type of abuse occurred more than ten times over the next two years while the victim lived at her grandmother's house and continued after she had moved to another house.

The victim described other instances of inappropriate behavior by the defendant. On one occasion, the defendant, while dressed only in boxer shorts, went into the victim's bedroom, got under the covers with her, and rubbed the victim's stomach and legs under her shirt and pajama bottoms. After the victim had moved to another house, she would, on occasion, sleep over at her grandmother's home. During several of these occasions, the defendant got into bed with the victim and rubbed himself against her so that she felt his penis against her back.

A few years later, the then sixteen year old victim began speaking with a therapist, and she disclosed the sexual abuse during her first session. At a therapy session attended by her mother and brother, the victim disclosed the sexual abuse by the defendant. Thereafter, on October 28, 2015, the victim reported the defendant's conduct to the police. The defendant was arrested in March, 2016.

In an information filed on February 7, 2019, the state charged the defendant with sexual assault in the third degree, sexual assault in the fourth degree, and risk of injury to a child. After trial, the court, *Alander, J.*, found

the defendant guilty of sexual assault in the third degree and risk of injury to a child and not guilty of sexual assault in the fourth degree. The court imposed a total effective sentence of twenty years of incarceration, execution suspended after twelve years, and fifteen years of probation. This appeal followed.

I

The defendant first claims that the court improperly admitted uncharged misconduct evidence that he also had sexually abused the victim's cousin, D. The defendant has presented two distinct arguments with respect to this claim. First, he argues that the court erred in its preliminary decision to permit the state to present evidence regarding D to show the defendant's propensity for such acts. Second, he contends that the court improperly denied his motion to strike all of the testimony regarding this uncharged misconduct after the prosecutors did not call D as a witness. We are not persuaded.

The following additional facts are necessary for our discussion. Approximately one week before the trial was to begin, the state filed a motion to allow the introduction of uncharged misconduct evidence pursuant to § 4-5 (b) of the Connecticut Code of Evidence.[2] In this motion, the state indicated that this uncharged misconduct evidence consisted of the victim's testimony that, in 2009, she learned that the defendant had sexually abused D over a period of time. The state represented that the victim would testify as to the reactions of her family with respect to D's disclosure and how that impacted her decision to report her own abuse. The state also indicated that D would testify as to the details of the sexual abuse. According to the state's motion, "[s]aid evidence will be offered to prove intent, identity, absence of mistake or accident, a system of criminal activity or to corroborate crucial prosecution testimony." On the first day of the trial, the defendant filed an objection to the state's motion to present uncharged misconduct evidence.

Prior to the start of evidence, the court heard argument regarding the uncharged misconduct evidence. The prosecutor represented that the victim was between the ages of eleven and fourteen years old during the alleged sexual abuse, and that D had been between the ages of ten and thirteen years old when the defendant had sexually abused her. The prosecutor indicated that the victim and D are related to each other and to the defendant, and that the sexual abuse occurred in a similar time frame, and, in part, at the same residence. The prosecutor acknowledged that, contrary to the facts of the present case, the sexual abuse of D involved digital and penile penetration. After hearing from defense counsel, the court granted the state's motion to present the uncharged misconduct evidence regarding the defendant's sexual abuse of D.

The victim testified that, at some point, she had learned that the defendant had sexually abused D. The court indicated that, during a conversation in chambers, the prosecutor had indicated that this aspect of the victim's testimony was not being offered for the truth of the matter asserted, namely, that the defendant had sexually abused D, but, rather, "just to show the effect on [the victim] about her receiving information concerning those incidents to then show why she acted as she did." After hearing from defense counsel, the court stated: "So, I will allow [the victim] to discuss what she heard about those incidents and relate what effect it had on her. It is my understanding it is the state's position that that led to her reluctance to disclose and that is why it is relevant."

The victim testified that she learned that D had made an allegation of abuse against the defendant to the police. The victim's mother, the victim's grandmother, and the rest of the family "sided" with the defendant and ostracized D and her mother, N. When asked how the family's reaction made her feel while her own abuse by the defendant was ongoing, the victim responded: "It made me feel like I was surrounded by adults who did not want to believe [D], who didn't believe a kid, who did not want—who would prefer to cover up and side with [the defendant], and I saw them bash her and criticize, and it felt in that moment safer for me to stay quiet and it felt safer to be with everyone else on his side and pretend like nothing happened and cover up my abuse, cover up her abuse." The victim subsequently stated that she did not disclose her own sexual abuse because no one in her family believed her cousin.

The next day, the victim's mother testified. The prosecutor asked her if, in 2011, she had learned that the defendant had sexually abused D. After an objection based on hearsay, the prosecutor indicated that this evidence was not being offered for its truth. The court ruled that the evidence was admissible for its effect on the victim's mother and her subsequent reaction. The victim's mother stated that, following the allegations of sexual abuse made by D against the defendant, the rest of the family "shunned" D and N.

The state subsequently sought to have a certified copy of the defendant's conviction for sexually abusing D admitted into evidence. The state noted that this document was not offered to establish the facts regarding the sexual abuse of D, or any admission by the defendant, but rather to "help show the time frame of the arrest and conviction on [D's] matter because it corroborates crucial state's testimony as far as what was happening with the family and why [the victim] in [this] case delayed in disclosing her sexual abuse by this defendant." Defense counsel objected and noted that, because the defendant had pleaded guilty pursuant to the *Alford* doctrine,[3] this evidence was inadmissible.

The court cited to § 4-8A of the Connecticut Code of Evidence[4] and sustained defense counsel's objection. At this point, the state rested.

Defense counsel immediately moved to strike all references to the uncharged misconduct evidence on the basis that D did not testify during the state's presentation of evidence. Defense counsel argued that the defendant's fundamental right to challenge and cross-examine D had been violated and that the appropriate remedy was to strike all references to the defendant's sexual abuse of D. After hearing from the prosecutor, the court noted that its initial ruling permitting the state to present evidence regarding the defendant's sexual abuse of D to show propensity was based on the expectation that D would testify.

After hearing further argument, including the state's request to open the evidence, the court ruled that the evidence regarding the defendant's abuse of D was not admissible to show that those acts had occurred, or that the defendant had a propensity to engage in such behavior, but was admissible "to show that [the victim] was aware of those claims and that impacted her decision to not disclose her own sexual—alleged sexual abuse because of the reaction within the family." The court declined to strike the testimony regarding the defendant's abuse of D but limited its purpose to show why the victim had delayed disclosing her own sexual abuse. The court further noted that the probative value of this evidence outweighed any prejudicial effect.

A

The defendant first argues that the court erred in its preliminary decision permitting the state to present evidence pertaining to the sexual abuse of D to show his propensity for such actions. The defendant contends that the court abused its discretion in admitting this evidence because the state failed to establish that this uncharged misconduct was similar to the offense charged or otherwise similar in nature to the circumstances of the aberrant and compulsive sexual misconduct at issue in the present case. See, e.g., Conn. Code Evid. § 4-5 (b); *State* v. *DeJesus*, 288 Conn. 418, 476–77, 935 A.2d 45 (2008). The state counters, inter alia, that we should not address this argument because the court superseded its ruling admitting the uncharged misconduct evidence for the purpose of propensity, and, therefore, the defendant cannot demonstrate prejudice. We agree with the state.

As we noted, following the state's offer of proof, the court initially admitted the uncharged misconduct evidence at issue for the purpose of demonstrating the defendant's propensity to engage in such conduct. The state failed, however, to introduce into evidence sufficient proof of the defendant's prior misconduct as to D. See, e.g., *State* v. *Holly*, 106 Conn. App. 227, 235–36,

941 A.2d 372, cert. denied, 287 Conn. 903, 947 A.2d 334 (2008). As a result, the court admitted this uncharged misconduct evidence for a limited purpose, namely, as an explanation for the victim's delayed disclosure, and not for the purpose of establishing that D actually had been sexually abused by the defendant or to establish his propensity to commit such acts of sexual abuse.

In support of its argument that we should not review this claim, the state directs us to *State* v. *Sanders*, 86 Conn. App. 757, 862 A.2d 857 (2005). In that case, the state filed motions in limine to restrict the cross-examination of a witness. Id., 763. "[T]he court granted the motions, precluding any reference to prior convictions or pending criminal charges and prohibiting any reference to [the witness'] involvement in drug trafficking and gang related activity." Id. The trial court subsequently granted the defendant's motion for reconsideration and permitted questions regarding past felony convictions and pending charges against the witness. Id. On appeal, the defendant claimed that the court improperly had restricted his cross-examination of this witness. Id., 762. We declined to review this claim because the defendant was not prevented from questioning the witness about his past and pending charges and, therefore, was not aggrieved by the court's ruling. Id., 764. Likewise, in the present case, we need not review the defendant's claim that the court abused its discretion in its initial ruling permitting the state to present propensity evidence because the court ultimately ruled that it was inadmissible for that purpose.

B

The defendant additionally argues that the court improperly denied his motion to strike all of the testimony regarding this uncharged misconduct after the state did not call D as a witness. Specifically, he contends that the prejudicial effect of this evidence outweighed its "minimal" probative value and that this inadmissible evidence affected the court's factual findings. The state counters, inter alia, that the court properly (1) admitted the evidence pertaining to D's abuse for a limited purpose and (2) denied the defendant's motion to strike. We agree with the state.

We begin with the relevant legal principles. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sampson*, 174 Conn. App. 624, 636, 166 A.3d 1, cert. denied, 327 Conn. 920, 171 A.3d 57 (2017); see also *State* v. *Courtney G.*, 339 Conn. 328, 337,      A.3d      (2021) (trial court given broad discretion in determining relevancy of evidence and

balancing probative value against prejudicial effect).

The evidence regarding the defendant's sexual abuse of D was properly admitted for the sole purpose of explaining the victim's delay in disclosing her own sexual abuse by the defendant. The defendant does not dispute that the evidence was relevant for this purpose. Thus, we must determine whether the prejudicial impact of this otherwise admissible evidence outweighed its probative value. See Conn. Code Evid. § 4-3. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the [fact finder]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Holmgren*, 197 Conn. App. 203, 211–12, 231 A.3d 379 (2020); *State* v. *Rosa*, 104 Conn. App. 374, 378, 933 A.2d 731 (2007), cert. denied, 286 Conn. 906, 944 A.2d 980 (2008).

"Our Supreme Court has identified four factors relevant to determining whether the admission of otherwise probative evidence is unduly prejudicial. These are: (1) where the facts offered may unduly arouse the [fact finder's] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the [fact finder] from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Joseph V.*, 196 Conn. App. 712, 761, 230 A.3d 644, cert. granted, 335 Conn. 945, 238 A.3d 17 (2020).

The defendant first contends that the uncharged misconduct evidence pertaining to D had only minimal probative value, given that the state had presented testimony from an expert[5] on the topic of delayed disclosure. The expert, however, had no knowledge of the facts of this case. It was the victim herself who testified that

she had delayed disclosing her abuse after she learned of the defendant's abuse of D and observed the subsequent "shunning" of D and N by the rest of her family. The evidence of D's abuse by the defendant was not cumulative of the expert testimony, and, therefore, we disagree that it had only "minimal" probative value.

The defendant's second contention is that the trial judge, as the finder of fact, was prejudiced after hearing of the defendant's sexual abuse of D. The defendant postulates that the court was unable to limit its consideration of this evidence to the sole purpose for which it had been admitted. Absent from the defendant's brief, however, is any reference to evidence from the proceedings to support this assertion.

Our Supreme Court recently has stated that, "[o]n appeal from a bench trial, there is a presumption that the court, acting as the trier of fact, considered only properly admitted evidence when it rendered its decision." (Internal quotation marks omitted.) *State* v. *Roy D. L.*, Conn. , , A.3d (2021); see also *State* v. *Ouellette*, 190 Conn. 84, 92, 459 A.2d 1005 (1983) ("[i]n trials to the court, where admissible evidence encompasses an improper as well as a proper purpose, it is presumed that the court used it only for an admissible purpose"). The defendant has failed to point us to anything in the record that would overcome this presumption.[6] We conclude, therefore, that this argument must fail.

## II

The defendant next claims that his right to a fair trial was violated by prosecutorial impropriety. The defendant argues that the prosecutors[7] committed impropriety by their efforts (1) to introduce evidence of the sexual abuse of D to show his propensity to engage in such behavior and then failing to call D as a witness, (2) to introduce evidence of his *Alford* plea from the sexual abuse case involving D, and (3) to introduce constancy of accusation evidence that did not meet the standard for admission and to comment on this evidence during closing argument. The state counters that there was no prosecutorial impropriety and that the defendant failed to establish a due process violation, if any prosecutorial impropriety did exist. We conclude that the defendant has not demonstrated any impropriety in this case.

We begin with the relevant legal principles. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine

whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the . . . verdict would have been different absent the sum total of the improprieties. . . . Accordingly, it is not the prosecutorial improprieties themselves but, rather, the nature and extent of the prejudice resulting therefrom that determines whether a defendant is entitled to a new trial. . . .

"To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams* [204 Conn. 523, 540, 529 A.2d 653 (1987)] . . . ." (Internal quotation marks omitted.) *State* v. *Franklin*, 175 Conn. App. 22, 46–47, 166 A.3d 24, cert. denied, 327 Conn. 961, 172 A.3d 801 (2017); see also *State* v. *Albert D.*, 196 Conn. App. 155, 162–63, 229 A.3d 1176, cert. denied, 335 Conn. 913, 229 A.3d 118 (2020).

The defendant's claims of prosecutorial impropriety originate with the prosecutors' efforts to have certain testimony or documents admitted into evidence. First, the prosecutors sought to have testimony regarding uncharged misconduct, namely, the defendant's sexual abuse of D, admitted as propensity evidence, but did not call D as a witness. The defendant argues that, whether intentional or not, the prosecutors essentially made a misleading representation to the court.

Second, the prosecutors attempted to admit a copy of the defendant's *Alford* plea from the case involving D to corroborate portions of the testimony regarding the defendant's sexual abuse of D, the family's reaction, and the time frame of those events. The defendant argues that the prosecutors knew, or reasonably should have known, that § 4-8A (a) (2) of the Connecticut Code of Evidence prohibits the admission of such evidence and that "[t]he only conceivable purpose for offering such irrelevant evidence—at a court trial where the judge sees and hears the inadmissible evidence before 'excluding' it—was to try to prejudice the fact finder . . . ."

Third, the prosecutors presented numerous instances of constancy of accusation testimony from the victim's friends, brother, and mother, and commented on this evidence during the prosecutors' rebuttal argument. The defendant argues that there was no "reciprocity" between the victim's testimony and that of the constancy witnesses. (Internal quotation marks omitted.) Therefore, the defendant argues that the constancy testimony from the friends, brother, and mother of the victim did not meet the standard for admissibility of constancy testimony, and, thus, should not have been admitted into evidence or commented on during closing argument by the prosecutors.

Impropriety may result from a prosecutor's efforts to introduce certain evidence. For example, in *State* v. *Angel T.*, 292 Conn. 262, 264, 973 A.2d 1207 (2009), our Supreme Court considered whether the prosecutor had committed an impropriety by introducing evidence of, and commenting on, the fact that the defendant, while represented by counsel, had failed to meet with the police during their investigation. "We agree with those jurisdictions that have concluded that a prosecutor violates the due process clause of the fourteenth amendment when he or she elicits, and argues about, evidence tending to suggest a criminal defendant's contact with an attorney prior to his arrest. In our view, this prohibition necessarily is founded in the fourteenth amendment due process assurances of a fair trial under which proscriptions on prosecutorial impropriety are rooted generally." Id., 281–82; see also *State* v. *Salamon*, 287 Conn. 509, 559–60, 949 A.2d 1092 (2007) (rejecting claim of prosecutorial impropriety due to excessive leading questions because majority of such questions fell within exceptions to general rule prohibiting them on direct or redirect examination and defendant failed to provide any reason why remainder of questions were themselves so prejudicial or harmful as to render trial unfair).

Our decision in *State* v. *Marrero*, 198 Conn. App. 90, 234 A.3d 1, cert. granted, 335 Conn. 961, 239 A.3d 1214 (2020), is particularly instructive. In that case, the defendant claimed, inter alia, that the prosecutor committed an impropriety by asking an excessive amount of leading questions during his direct examination of the victim. Id., 97–98. In addressing this issue, we looked to our Supreme Court's decision in *State* v. *Salamon*, supra, 287 Conn. 509. *State* v. *Marrero*, supra, 99–100. "The upshot of *Salamon* is that to establish the impropriety prong of a claim of prosecutorial impropriety based on a prosecutor's allegedly excessive use of leading questions on direct examination of the state's witnesses, the defendant must prove not only that such questioning was improper in the evidentiary sense but that it was improper in the constitutional sense as well because it threatened his due process right to a fair trial." Id., 101.

In considering whether the use of excessive leading questions threatened to violate the defendant's constitutional right to a fair trial, we set forth the following guidance: "Our case law, however, and that of our sister jurisdictions, furnish several useful examples of such circumstances, including, but not limited to, repeatedly asking improper leading questions after defense objections to those questions have been sustained, *asking questions stating facts that the prosecutor has no good faith basis to believe are true, asking questions referencing prejudicial material that the prosecutor has no good faith basis to believe is relevant and otherwise admissible at trial* . . . ." (Emphasis added; footnotes

omitted.) Id., 101–102.

In the present case, the defendant does not contend that the prosecutors asked an excessive amount of leading questions but, rather, maintains that their efforts regarding the introduction of uncharged misconduct evidence and the defendant's *Alford* plea amounted to prosecutorial impropriety. He further asserts that the prosecutors misrepresented information to the court with respect to the former and lacked any basis to offer the latter and that, therefore, the prosecutors lacked a good faith basis with respect to these evidentiary matters. We disagree.

With respect to the uncharged misconduct evidence, in response to the defendant's motion to strike such evidence after the state rested without calling D as a witness, the prosecutor argued that the evidence of the defendant's sexual abuse of D was admissible for the purpose of demonstrating the defendant's propensity for such unlawful conduct and was established through the testimony of the victim, her brother, and her mother. The prosecutor further indicated that, with the permission of the court, she could have D testify without delay, despite having rested. Although the prosecutor erred in her consideration of what was necessary for uncharged misconduct to be admitted into evidence, the defendant has neither demonstrated the lack of a good faith basis by the prosecutor, nor shown that his right to a fair trial was threatened.

With respect to the prosecutor's attempt to have the defendant's *Alford* plea admitted into evidence, we again note that the prosecutor presented a good faith basis for admitting the plea offer. The prosecutor argued that, despite § 4-8A of the Connecticut Code of Evidence, the defendant's *Alford* plea was admissible to corroborate the testimony of the state's witnesses. The court sustained the objection of defense counsel and did not admit this evidence, and the defendant on appeal has failed to establish a lack of a good faith basis on the part of the prosecutor or to show that his right to a fair trial was threatened.

Finally, regarding the claimed lack of reciprocity between the victim's testimony and that of the constancy witnesses, we conclude that this argument is without merit. The defendant failed to object to nearly all of the constancy testimony and, furthermore, he has not persuaded us that the prosecutor's efforts to have this testimony admitted into evidence rose to the level of impropriety. Moreover, as the state properly points out in its brief, once this constancy evidence was admitted into evidence, the prosecutors could comment on it during closing argument. "Our Supreme Court has held that "[a]rguing on the basis of evidence explicitly admitted . . . cannot constitute prosecutorial [impropriety]." (Internal quotation marks omitted.) *State* v. *Devito,* 159 Conn. App. 560, 575, 124 A.3d 14, cert.

denied, 319 Conn. 947, 125 A.3d 1012 (2015). Accordingly, we conclude that the defendant has failed to establish prosecutorial impropriety.

III

The defendant next claims that the court improperly denied him access to the journals of the victim. Specifically, he argues that he was entitled to the contents of these journals because the victim had reviewed them prior to her testimony and they constituted a statement pursuant to Practice Book §§ 40-13A[8] and 40-15 (1).[9] The state counters that (1) the court did not abuse its discretion in determining that the journals did not need to be produced for inspection following the victim's review prior to testifying pursuant to § 6-9 of the Connecticut Code of Evidence and (2) the defendant's claim pursuant to Practice Book §§ 40-13A and 40-15 (1) was waived. We agree with the state.

The following additional facts are necessary for the resolution of this claim. The victim testified on the first day of trial, February 13, 2019. During her testimony, the victim stated that the first person she had told about the sexual abuse was Milagros Vizueta, a therapist in North Branford.[10] During these sessions, Vizueta occasionally took notes and would write down things for the victim to "work on . . . ." During redirect examination, the prosecutor inquired whether the victim ever had seen her records from the therapy with Vizueta. The victim responded: "I have my journals. . . . I don't have—I don't know her records, but I have my journals."[11] Upon further inquiry, the victim stated: "For the journals, [Vizueta] would have me write a lot about either my relationship to [the defendant], with [the defendant], how the abuse happened, I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal we'd write about—like if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom." The victim also stated that the journals were her "words through therapy."

On recross-examination, defense counsel inquired whether the victim had reviewed her journals prior to her testimony. The victim responded that she had looked at a "few pages" in one of her journals. The following colloquy between the victim and defense counsel then occurred:

"Q. Okay. Were those—and the—the journals that you have, are those your notes that [you] wrote at the time things were happening?

"A. No, it was while I was in therapy.

"Q. Okay. But it was part of the therapy process about what you spoke to the doctor about, what she told you and what happened to you, right?

"A. Yes.

"Q. And it would be much closer in time to the events that we're talking about; fair to say?

"A. When I was journaling, closer to the abuse, yes."

"Q. Would—would those be the best record you have of what happened? [The court overruled an objection by the state.]

"A. . . . Yes.

"Q. Okay. And you still have those journals?

"A. Yes."

At this point, defense counsel requested an in camera review of the victim's journals. The prosecutor objected, arguing that the journals did not constitute medical records, but rather were akin to a diary. The court inquired whether the journals were privileged documents, by statute or common law. The prosecutor then requested time to research the issue. Defense counsel suggested that the court should review the journals for exculpatory material. The court responded that the obligation to review the journals for exculpatory material rested with the prosecutors and that, if there was a claim of privilege, it would conduct an in camera review. Defense counsel responded: "I am asking for it as discovery; however, I was trying to be as respectful as I could be to the complainant." The court then suggested a further discussion of this issue in chambers and mentioned the possibility of recalling the victim as a witness, if necessary.

The next day, February 14, 2019, the court summarized the discussions that had occurred in chambers: "I have determined that [the victim's] journals should be reviewed by the state to determine, what, if anything in those journals [comprised of three notebooks totaling approximately 200 pages] concern—comprise statements by [the victim] concerning the incidents in questions here, and any exculpatory material. That upon that review they should disclose to defense counsel any such material, specifically statements made by [the victim] in her journals concerning the sexual assault allegations here or any exculpatory material, and if there is anything the state is uncertain as to whether it is exculpatory [the prosecutors] can provide those portions of the journals to me and I will review them in camera to determine whether they should be disclosed to defense counsel.

"It is my understanding that the state has talked to [the victim]. She has agreed to provide the journals to them, they will be provided to the state sometime this afternoon, and the state—but apparently the journals are in Spanish so the state needs the assistance of someone on their staff to interpret those journals so that they can fulfill their obligation as I've outlined them." The prosecutors and defense counsel agreed with the court's summary, and neither side raised any

objection.

The next day, the court placed the following on the record: "It is my order that the state review those journals to determine if there is any exculpatory information with respect to those journals that need to be disclosed to the defendant, and that includes any inconsistent statements and any statements regarding the therapy method used that may have fostered or—instructed her to use her imagination or speculate or embellish as to what happened but, basically, the . . . state needs to review those journals under its *Brady* obligations and— turn over to the defendant anything that is exculpatory."

The court then confirmed that defense counsel had argued that at least some portions of the journals were subject to disclosure because the victim had reviewed them prior to her testimony. The prosecutor countered that, aside from any *Brady* material, defense counsel was not entitled to review the victim's private journals. The prosecutor further represented that her investigator had started the process of reviewing the 200 pages, which were handwritten in Spanish, and, after several hours of review, had not discovered any exculpatory material. The prosecutor also assured the court that she had given the investigator "very, very clear instructions on what is exculpatory and what is not. I sat in an office directly next to her, so if she had any questions at all she came to me, and there is nothing exculpatory or inconsistent so far at all . . . ."

The court then considered the defendant's claim that he was entitled to the journals because the victim had used them to refresh her memory prior to her testimony. After reading § 6-9 of the Connecticut Code of Evidence, the court stated: "In light of the fact that [the victim] testified that she only used a few pages of journals that consisted of hundred—at least, apparently, a couple hundred pages, and the fact that the state would be reviewing all the journals with the obligation to turn over any exculpatory evidence to the defendant, I am not going to order that the entire journals be turned over to the defense for examination. Also, in light of the private nature of those journals." The court indicated it would make the journals a court exhibit, and the parties noted their agreement that a translation was not necessary at that point.

On the next day of trial, February 25, 2019, the prosecutor indicated that the investigator had completed the review of the victim's journals.[12] Pursuant to General Statutes § 54-86c (b),[13] the prosecutors submitted, in a sealed envelope, four pages from the journals for review by a court for a determination of whether they contained exculpatory material. In their view, the contents of these four pages were protected by General Statutes § 54-86f,[14] but, "in the abundance [of] caution," sought a judicial determination as to whether these items should

be disclosed to the defense.

Later that day, the court indicated that it had reviewed the four pages from the journals submitted by the prosecution and determined that one page should be disclosed to the defense. Specifically, the court stated: "One of the material issues in this case is the—is [the victim's] claim that she delayed disclosure of the alleged assaults by the defendant because, when [D] reported such assaults, the family rallied behind the defendant and she felt that there was no one she could report this assault to and be supported. . . . There is an incident [here] where she disclosed a claim of sexual abuse to her mother, which could be interpreted as the mother then supporting her claim. So, I think it is material and exculpatory so I will order it disclosed to the defendant."

On February 26, 2019, the court granted the defendant's motion to recall the victim as a witness. During redirect examination by the prosecutor, the victim explained that, following a prompt from Vizueta, she wrote a passage in her journal about what "an environment in which speaking about abuse should have looked like, instead of what I grew up in." Thus, the statements in her journal in which the victim wrote that she had disclosed a sexual assault by a different family member to her mother was hypothetical in nature and part of a therapy exercise, and not based on actual events.

A

The defendant first argues that he was entitled to review the contents of the journals because the victim had reviewed them prior to her testimony. Specifically, he contends that the court abused its discretion in not requiring the disclosure of the entirety of the journals on this basis. We disagree.

Our starting point is § 6-9 (b) of the Connecticut Code of Evidence, which provides in relevant part: "If a witness, before testifying, uses an object or writing to refresh the witness' memory for the purpose of testifying, the object or writing need not be produced for inspection unless the court, in its discretion, so orders. . . ." The official commentary to this subsection states that § 6-9 (b) "establishes a presumption against production of the object or writing for inspection in this situation . . . ." We review the trial court's decision on whether to order production of such an object or writing for an abuse of discretion. See *State* v. *Cosgrove*, 181 Conn. 562, 588–89, 436 A.2d 33 (1980); *State* v. *Watson*, 165 Conn. 577, 593, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974). "In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse

of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Fortin*, 196 Conn. App. 805, 819, 230 A.3d 865, cert. denied, 335 Conn. 926, 234 A.3d 979 (2020); see also *State* v. *Maner*, 147 Conn. App. 761, 767, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

We conclude that the court did not abuse its discretion in not requiring the disclosure of the contents of the victim's journals to the defendant. As we previously noted, the court, in ruling on this request, considered the private nature of the journals, that the victim had reviewed only a few pages of the journals before testifying, and that the state was in the process of reviewing the entirety of the journals for exculpatory material. The court's consideration and its ultimate decision was neither so arbitrary as to vitiate logic nor based on improper or irrelevant factors. We cannot conclude, therefore, that the court abused its discretion.

B

The defendant next argues that he was entitled to the contents of the victim's journals because they constituted a statement pursuant to Practice Book §§ 40-13A and 40-15 (1). The state counters that the defendant waived this claim before the trial court, and, therefore, we should not review it. We agree with the state.

On March 21, 2016, the defendant filed a motion for discovery, requesting that the state provide him with various materials. During the first day of the trial, both the prosecutors and defense counsel learned of the existence of the victim's journals. During the discussion regarding whether the court should review the contents of the journals, defense counsel indicated that he was requesting the journals as part of discovery, but in a manner respectful to the victim. The parties agreed to end the testimony of the victim, subject to her being recalled as a witness depending on the contents of the journals. The court then adjourned to discuss the issues regarding the journals with counsel in chambers.

The next morning, the court stated on the record that, following chambers discussions with the prosecutors and defense counsel, the state would review the journals for exculpatory material and any statements made by the victim regarding the incidents in question. If the journals contained such items, they would be disclosed to the defense. Additionally, the court stated that it would conduct an in camera review of any items that the state thought might be exculpatory. Defense counsel expressly agreed that the court's statements were consistent with what had been discussed pre-

viously in chambers, and raised no objection to that procedure. The next day, the court clarified its order as to the state's obligations in reviewing the journals. Again, defense counsel made no objection to this process. On the last two days of trial, when the parties discussed this issue with the court, defense counsel raised no objection and did not attempt to obtain the contents of the journals pursuant to Practice Book §§ 40-13A and 40-15 (1).

On the basis of this record, we conclude that the defendant waived the claim that he was entitled to the contents of the victim's journals because they constituted a statement pursuant to the rules of practice. Defense counsel agreed to the procedure to be used in the review of, and potential disclosure of, the contents of the journals, and the defendant cannot now challenge said procedure. "When the defendant consented to the procedures, he waived his right to challenge them later on appeal. Our procedure does not allow a defendant to pursue one course of action at trial and later, on appeal, argue that the path he rejected should now be open to him. . . . For this court to rule otherwise would result in trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State* v. *Santaniello*, 96 Conn. App. 646, 669, 902 A.2d 1, cert. denied, 280 Conn. 920, 908 A.2d 545 (2006).

Our decision in *State* v. *Tierinni*, 165 Conn. App. 839, 140 A.3d 377 (2016), aff'd, 329 Conn. 289, 185 A.3d 591 (2018), provides additional support for this conclusion. In that case, the trial court informed the parties of its practice to hear brief evidentiary arguments at sidebar to avoid excusing the jury each time. Id., 843–45. The substance of these discussions would be placed on the record at a later time. Id., 844. In the event that the matter needed to be addressed immediately, the court indicated its willingness to excuse the jury. Id., 845. When asked if the parties objected to this procedure, both the prosecutor and defense counsel responded in the negative. Id. On appeal, the defendant claimed that he had been excluded from critical stages of the proceedings in violation of his state and federal constitutional rights as a result of the court's procedure with respect to evidentiary objections. Id., 841. We concluded that, by agreeing to the proposed procedure, the defendant had waived this claim. Id., 843.

In *Tierinni*, we first set forth the definition of waiver. "[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of

understanding. . . .

"Put another way, [w]e do not look with favor on parties requesting, or agreeing to, an instruction or a procedure to be followed, and later claiming that that act was improper. . . . [S]ee . . . *State* v. *Thompson*, 146 Conn. App. 249, 259, 76 A.3d 273 (when party consents to or expresses satisfaction with issue at trial, claims arising from that issue deemed waived and not reviewable on appeal), cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013); *State* v. *Crawley*, 138 Conn. App. 124, 134, 50 A.3d 349 (appellate court cannot permit defendant to elect one course at trial and then to insist on appeal that course which he rejected at trial be reopened), cert. denied, 307 Conn. 925, 55 A.3d 565 (2012)." (Citations omitted; internal quotation marks omitted.) *State* v. *Tierinni*, supra, 165 Conn. App. 847–48.

Next, we noted that the actions of counsel could effect a waiver, and that when a party consents to the use of a procedure at trial, a claim arising from that procedure was not reviewable on appeal. Id., 849. Consequently, by accepting and acquiescing to the court's procedure, the defendant waived his claim that he was denied the right to be present at the sidebar discussions. Id.

In the present case, the defendant, through his counsel, agreed to the prosecutors' review of the journals and to the court's in camera review of any materials that might be exculpatory. Having agreed to this procedure before the trial court, the defendant cannot obtain appellate review of this claim.

IV

The defendant's final claim is that his rights under *Brady* v. *Maryland*, supra, 373 U.S. 83, were violated as a result of the procedures employed by the prosecutors with respect to the review of the victim's journals for exculpatory information. Specifically, he contends that, under these facts and circumstances, the prosecutors were required to personally review the contents of the journals and that this task could not have been delegated to an inspector working for the prosecutors. We disagree.

The defendant acknowledges that this claim was not raised before the trial court and, therefore, seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Pursuant to this doctrine, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a

fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Citation omitted; emphasis in original, internal quotation marks omitted.) *State* v. *Castro*, 200 Conn. App. 450, 456–57, 238 A.3d 813, cert. denied, 335 Conn. 983, 242 A.3d 105 (2020); see generally *State* v. *Rosa*, 196 Conn. App. 480, 496–97, 230 A.3d 677 (defendant's unpreserved *Brady* claim reviewable pursuant to *Golding* bypass doctrine), cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020). The record is adequate and the defendant's claim is of constitutional magnitude, and, thus, the first two *Golding* prongs are satisfied. Our focus, therefore, is on whether the defendant demonstrated that a constitutional violation occurred. *State* v. *Rosa*, supra, 497.

"Our analysis of the defendant's claim begins with the pertinent standard, set forth in *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's right to a fair trial. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . In *Strickler* v. *Greene*, 527 U.S. 263, [281–82], 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), the United States Supreme Court identified the three essential components of a *Brady* claim, all of which must be established to warrant a new trial: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [s]tate, either [wilfully] or inadvertently; and prejudice must have ensued. . . . Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . If . . . [the defendant] . . . fail[s] to meet his burden as to [any] one of the three prongs of the *Brady* test, then [the court] must conclude that a *Brady* violation has not occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Rosa*, supra, 196 Conn. App. 497–98; see also *State* v. *Bryan*, 193 Conn. App. 285, 315, 219 A.3d 477, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019).

Our Supreme Court has summarized the obligations of the prosecutor with respect to *Brady* as follows. The state has a duty, pursuant to *Brady*, to disclose evidence that is favorable to the defense and material to the case. *State* v. *Guerrera*, 331 Conn. 628, 646–47, 206 A.3d 160

(2019). "As the state's representative, the prosecutor has a broad obligation to disclose *Brady* material because principles of fundamental fairness demand no less. . . . This obligation extends to evidence favorable to the defense that is not in the possession of the individual prosecutor responsible for trying the case; indeed, the obligation may encompass such evidence even if it is not known to the prosecutor. . . . More specifically, the prosecutor's duty of disclosure extends to *Brady* material that is known to the others acting on the government's behalf in [the case], including, but not limited to, the police. . . . In other words, the prosecutor is deemed to have constructive knowledge of *Brady* material possessed by those acting on the state's behalf. . . . Thus, the prosecutor has a duty to learn of exculpatory evidence in possession of any entity that is acting as an agent or arm of the state in connection with the particular investigation at issue." (Citations omitted; internal quotation marks omitted.) Id., 647; see also *Kyles* v. *Whitley*, 514 U.S. 419, 437–38, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (individual prosecutor has duty to learn of any favorable evidence known to others acting on government's behalf, including police). Simply stated, the individual prosecutor or prosecutors trying a specific case bear the ultimate responsibility for compliance with the disclosure of evidence as required by *Brady* and its progeny. *United States* v. *Jennings*, 960 F.2d 1488, 1490 (9th Cir. 1992).

In the present case, the defendant has alleged a somewhat unusual *Brady* violation. He claims that the victim's journals needed to be reviewed personally by a prosecutor, rather than "a nonlawyer member" of the prosecutors' office. As we noted in part III of this opinion, the prosecutors assigned the task of reviewing the victim's journals, which were written in Spanish, to a bilingual, experienced investigator. They provided her with detailed instructions regarding this review, and a prosecutor remained available to answer any questions that arose during this process. The defendant contends, however, that in this case, the review of the victim's journals could not be delegated to a nonlawyer but, rather, required a personal review by the prosecutors in order to avoid violating his constitutional rights to due process.

In support of his argument, the defendant relies on language from cases stating that the prosecutor trying a particular case bears the ultimate responsibility for disclosing *Brady* materials independent from any conclusion reached by others acting as agents of the state in connection with the particular investigation. See, e.g., *Kyles* v. *Whitley*, supra, 514 U.S. 437; *State* v. *Guerrera*, supra, 331 Conn. 647, 656; see also, e.g., *McMillian* v. *Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2514, 138 L. Ed. 2d 1016 (1997); *Walker* v. *New York*, 974 F.2d 293, 299 (2d Cir. 1992), cert. denied, 507 U.S. 961, 113 S. Ct. 1387,

122 L. Ed. 2d 762 (1993), cert. denied, 507 U.S. 972, 113 S. Ct. 1412, 122 L. Ed. 2d 784 (1993). These cases, however, do not support the claim advanced by the defendant in the present case. For example, the United States Court of Appeals for the Second Circuit has explained that the police satisfy their duty pursuant to *Brady* when they turn over exculpatory material to the prosecutor. *Walker* v. *New York*, supra, 298–99. The prosecutor, on the basis of his or her legal acumen, then determines whether this material must be disclosed to the defense. Id., 299. The Second Circuit then explained: "A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion. It also would ignore the fact that the defendant's appropriate point of contact with the government during litigation is the prosecutor and not those who will be witnesses against him." Id. Thus, the Second Circuit clearly instructed, as a general rule, that the police are obligated to turn over material to the prosecutor's office for a determination of what is to be disclosed to the defense in order to comply with *Brady*. *Walker* does not, however, stand for the proposition that only the prosecutor in a case, and not a member of his or her staff acting under his or her supervision, may review materials for a determination of whether disclosure is required under *Brady*. See, e.g., *United States* v. *Claridy*, United States District Court, Docket No. 02:CR498 (LMM) (S.D.N.Y. March 20, 2003) (noting that *Kyles* v. *Whitley*, supra, 514 U.S. 419, did not require assigned prosecutor to personally review all relevant Securities and Exchange Commission personnel files in joint investigation).

Additionally, we note that the United States Court of Appeals for the Ninth Circuit twice has rejected the claim that an assistant United States attorney may be personally ordered to review for *Brady* material, before the trial, the personnel files of law enforcement officers expected to testify at trial. *United States* v. *Herring*, 83 F.3d 1120, 1122–23 (9th Cir. 1996); *United States* v. *Jennings*, supra, 960 F.2d 1488–89. In the latter case, the court noted that the assistant United States attorney prosecuting a case bore the responsibility for complying with *Brady* and its progeny. *United States* v. *Jennings*, supra, 1490. Cognizant of separation of powers concerns vis-à-vis a court interfering with prosecutorial independence, and relying on the lack of case law requiring the personal efforts of an assistant United States attorney to review these personnel files and the absence of any indication that the prosecution would not adhere to its duties and obligations under *Brady*, the court determined that the United States District Court for the Southern District of California had improperly required personal review of the files by the assistant United States attorney. Id., 1490–92. In *United States* v. *Herring*, supra, 1121–23, the Ninth Circuit rejected the defendant's argument that *Jennings* had

been overruled by the United States Supreme Court's decision in *Kyles* v. *Whitley*, supra, 514 U.S. 419. See also *United States* v. *Martin*, United States District Court, Docket No. 2:15-CR-0235 (TLN) (E.D. Cal. August 11, 2016). Additionally, the United States District Court for the Southern District of New York has noted that the Second Circuit does not have a requirement that prosecutors personally review the personnel files of anticipated government employee witnesses. *United States* v. *Principato*, United States District Court, Docket No. 01:CR588 (LMM) (S.D.N.Y. October 16, 2002).[15]

In the present case, the defendant has failed to demonstrate, through controlling or persuasive authority, that the prosecutors in the present case were required to personally review the contents of the victim's journals to satisfy *Brady*. We emphasize that, ultimately, the obligation for complying with *Brady* rests with the prosecutor, but it does not follow that the personal review of items such as the victim's journals by a prosecutor is constitutionally required. Accordingly, we conclude that, because the defendant has failed to establish a constitutional violation under the third *Golding* prong, his claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** This case originally was argued before a panel of this court consisting of Judges Moll, Alexander, and Devlin. Thereafter, Judge Devlin retired from this court and did not participate in the consideration of this decision. Judge DiPentima was added to the panel, and she has read the briefs and appendices and has listened to a recording of the oral argument prior to participating in this decision.

[1] The defendant also claims that his waiver of a jury trial was not made knowingly, intelligently, and voluntarily, and, therefore, that he was denied his federal and state constitutional rights to a jury trial. Specifically, he contends that the trial court failed to inform him that, at a jury trial, he would have the opportunity to participate in the jury selection process. The defendant concedes, however, that our Supreme Court previously has rejected such a claim. See *State* v. *Ouellette*, 271 Conn. 740, 747–58, 859 A.2d 907 (2004); *State* v. *Cobb*, 251 Conn. 285, 374, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). He further recognizes that, as an intermediate appellate court, we are bound by those decisions. See, e.g., *State* v. *Corver*, 182 Conn. App. 622, 638 n.9, 190 A.3d 941, cert. denied, 330 Conn. 916, 193 A.3d 1211 (2018). The defendant, therefore, has briefed this claim only to preserve it for further review before our Supreme Court or the United States Supreme Court. We, therefore, need not address it.

[2] Section 4-5 (b) of the Connecticut Code of Evidence provides: "Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect."

[3] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[4] Section 4-8A (a) of the Connecticut Code of Evidence provides in relevant part: "Evidence of the following shall not be admissible in a civil or criminal case against a person who has entered a plea of guilty or nolo contendere in a criminal case . . . (2) a plea of nolo contendere or a guilty plea entered under the *Alford* doctrine . . . ."

[5] Janet Murphy, a pediatric nurse practitioner, testified as an expert in the field of behavioral characteristics of child sexual abuse victims. Murphy testified that, in general, a delayed disclosure is very common for child victims of sexual abuse.

[6] We also note that the court, albeit in a different context, stated: "I feel comfortable reviewing it because, as a judge, I am trained to only concentrate on admissible evidence and not inadmissible evidence . . . ." The court further noted: "Having done this for a long period of time I have a fair amount of confidence in my ability to separate what is admissible and what is inadmissible evidence . . . ."

[7] Two assistant state's attorneys conducted the prosecution of the defendant.

[8] Practice Book § 40-13A provides: "Upon written request by a defendant and without requiring any order of the judicial authority, the prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged, subject to the provisions of Sections 40-10 and 40-40 et seq."

[9] Practice Book § 40-15 provides in relevant part: "The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means: (1) A written statement made by a person and signed or otherwise adopted or approved by such person . . . ."

[10] During cross-examination, the victim testified that Vizueta had studied psychology in Peru and that she subsequently was informed that Vizueta was not a licensed therapist in Connecticut.

[11] On the basis of our review of the transcripts, it appears that neither the prosecutors nor defense counsel had been aware of these journals until the victim mentioned them during her testimony.

[12] The prosecutor represented the following to the court: "These records . . . were reviewed by my office, specifically . . . [by] . . . an investigator for the state's attorney's office, she has been with the state's attorney's office for fifteen years, she has been an investigator in our office for five years, she is bilingual, she is a 2013 graduate of Albertus Magnus College with a major in Criminal Justice. She was instructed by [the prosecutors] as far as what she was looking for, we explained to her very carefully what the state's obligation is for exculpatory and *Brady* material.

"She indicated that she spent about ten hours reviewing these materials because they are in Spanish, and she took her time. These materials never left the state's attorney's possession; they did not go to her home, they were done during business hours. She indicated that she spent about ten hours reviewing them and whenever she had any questions she would talk to [the prosecutors] . . . ."

[13] General Statutes § 54-86c (b) provides: "Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge, who shall not be the same judge who presides at the hearing of the criminal case if the case is tried to the court, to determine whether any material or information is exculpatory."

In the present case, the parties agreed that Judge Alander could review the four pages from the victim's journals to determine whether there was any exculpatory material contained therein.

[14] General Statutes § 54-86f (a) provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would

violate the defendant's constitutional rights. . . ."

[15] See also *United States* v. *Thomas*, United States District Court, Docket No. 1:18-CR-00458 (WJ) (D. N.M. October 23, 2018) (government satisfied its *Brady* duty by following current Department of Justice policy in which Drug Enforcement Agency attorneys and staff review personnel files and produce any exculpatory or impeachment materials to assistant United States attorney); *United States* v. *Burk*, United States District Court, Docket No. 3:15-CR-00088 (SLG-DMS) (D. Alaska September 8, 2016) (courts lack authority to order assistant United States attorney to personally review personnel files).

---